Benjamin JONES et al., Plaintiffs,
Appellants,

v.

James T. LYNN et al., Defendants,
Appellees.

No. 73–1057.

United States Court of Appeals,
First Circuit.

Heard March 5, 1973.

Decided March 22, 1973.

Patrick J. King and Daniel D. Sullivan, Boston, Mass., with whom Robert Condlin, Cambridge, Mass., and Peter J. O'Connor, were on brief, for appellants.

Arthur G. Coffey, Asst. Gen. Counsel, Boston, Mass., with whom John C. Conley, Gen. Counsel, Boston, Mass., was on brief, for appellees, Boston Redevelopment Authority and others.

Frederic R. Kellogg, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., was on brief, for appellees, the Secretary of Dept. of Housing and Urban Development, and others.

John Paul Sullivan, Boston, Mass., with whom Lewis H. Weinstein, Boston, Mass., was on brief, for appellees, First Church of Christ Scientist.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This appeal, expedited to accommodate all of the parties and interests involved, presents the issue whether a complex area renewal project covering a substantial sector of Boston, the Symphony Area part of the Fenway Urban Renewal Project, the basic planning and federal financial commitment for which had been approved in 1967, but which is yet substantially incomplete, is subject in any way to the requirements of the sub-

sequently enacted National Environmental Policy Act of 1969 (NEPA), 42 U.S. C. § 4331 et seq.

Appellants, residents of the area, sought to enjoin further demolition and construction in the area until an environmental statement is issued in accordance with NEPA. Appellees are the Department of Housing and Urban Development (HUD), the source of federal financial assistance; the Boston Redevelopment Authority (BRA), the municipal agency in charge of the project; and the First Church of Christ, Scientist, a prominent occupant of the area and source of much of the planning.[1] The district court denied injunctive relief, finding that "major federal action" terminated with the signing of the HUD-BRA Loan and Grant Contract in 1967, that HUD's continuing role was minor since it was powerless to alter future courses of action, and that NEPA was not intended to be applied retroactively.

## I. Facts

Some appreciation of the past history and present status of the project is necessary to recognize the grey zone in which we endeavor to strike a just and practicable balance.

In the early 1960's the Church, desirous of establishing an International Center on its present location and of developing the adjacent Symphony Area, commissioned the preparation of a master plan which incorporated these ideas with others calling for residential and commercial development. The Church plan was submitted to BRA and included in BRA's larger proposed effort for development of the Fenway Area which was

thereafter to consist of the Museum Area, Medical Center Area and the Symphony Area, all three sub-areas being of somewhat equal size and totalling 506 acres. Only questions relevant to the Symphony Area are before us. The entire Fenway Urban Renewal Plan, dated November 1, 1965, was approved by BRA on November 24, 1965; by the Boston City Council on December 20, 1965; by the Mayor of Boston on December 23, 1965; and by the Massachusetts Department of Commerce and Development on April 26, 1967 after the required public hearings. On December 22, 1967 HUD and BRA executed a Loan and Capital Grant Contract to provide federal assistance to this project pursuant to the Housing Act of 1949, 42 U. S.C. § 1450 et seq., which allows for a contractual relationship between a local public agency, here BRA, and the United States. The availability of federal assistance had been certified in compliance with the Housing Act only after HUD review of the program established that BRA had presented a "Workable Program for Community Improvement".

While the 1967 contract authorized BRA to sell project loan notes up to $14,488,759, a relocation grant of $719,-804 and a capital grant of $8,651,134, these sums were subsequently increased. On August 28, 1968 an amendatory contract added a rehabilitation grant of $12,000. More relevant here were an authorized increase in the amount of interest to be paid on temporary loan notes to be sold by BRA, the result of a June 24, 1970 amendment to the original contract; and an increased relocation grant to $5,660,424 and an increased

---

[1]. We have already affirmed the denial of injunctive relief sought against the Church, involving buildings owned by it in close proximity to its "Mother Church" building, the exterior of which has been remodelled in accordance with the 1967 planning which contemplated the demolition of the buildings. Not only was this demolition the last inevitable integral step in an eight-year plan for completing the Church mall which has never been changed in this respect, but during the

pendency of this appeal the tenants of the affected buildings have withdrawn from the case. Thus, our affirmance, insofar as the Church is concerned, was based on the unlikelihood of appellants establishing a case for equitable relief. We did not reach the question whether, absent equitable considerations, there was a sufficient nexus between the Church and HUD to subject its area to the requirement of a NEPA statement.

current temporary loan authorization to $19,441,374, both the result of an August 11, 1972 amendment. Currently, approximately $1,866,000 out of an approved budget, exclusive of relocation funds, of some $13,769,000—which includes the original federal capital grant of over eight million dollars with the remainder coming from state and local funds—remains unexpended or unencumbered. Approximately $4,675,000 of the federally-provided relocation grant is similarly at BRA's disposal.

A survey of the state of the real estate is more understandable than a financial analysis of monies unexpended. There are 27 parcels and sub-parcels in the part of the project which is before us. From the documents in evidence, we distill the following status, which we list for further reference in groups:

| Group | Number of Parcels | Present Status |
|---|---|---|
| I | 4 | —development wholly or nearly completed (Nos. 2, 11, 16A, 16B–1); no injunction sought as to these parcels. |
| II | 1 | —site cleared; developer tentatively selected; planned for residence for the elderly; no injunction sought as to parcel (No. 5). HUD will subject it to a modified environmental clearance procedure. |
| III | 3 | —site cleared; developers not selected for two parcels (Nos. 6, 16B–2); selected for the other (No. 3). As to this site HUD will submit it to a modified clearance procedure. No. 6 has no final planned purpose (except that it is to be part residential and part commercial); No. 16B–2 is planned for a park; No. 3 is planned for middle income housing with HUD financing. |
| IV | 5 | —sites where no demolition has yet occurred (Nos. 7, 9, 12, 13, 15 [2]). Nos. 7 and 15 are tentatively planned to be rehabilitated. Nos. 9, 12, and 13 are planned for low and middle income housing, with HUD financing for at least Nos. 9 and 13. |
| V | 14 | —no plans for acquisition or use (Nos. 1, 4, 8, 10, 14, 17, 18, 19, 19A, 19B, 20, 21, 22, 23). |

It is apparent that the parcels in groups IV and V and some or all of those in group III, a total of from 19 to 22 of the project's 27 parcels, fall in the early stages of planning. Nevertheless, the entire project has been in the planning stage for some seven years and has been subject to numerous hearings and deliberations at various levels.

## II. General Applicability of NEPA to Previously Planned Projects.

It is against this factual background that we endeavor to assess whether NEPA, enacted subsequent to the basic Loan and Capital Grant Contract, can be the source of any present obligation. We do not start with *tabula rasa*. The slate has been written on for some years. The question is whether there is at this time any requirement for a NEPA environmental statement—not the unrestricted analysis that might otherwise be expected if the project had not yet been launched, but a statement taking as a given those things which have been done in reliance on a preexisting plan.

We dispose without difficulty of appellees' contention that Congress intended to exempt from the application of NEPA pertinent projects simply because they had been previously decided upon. An environmental disturbance is no less consequential because of the date of its planning. If appellees are correct, the federal government is in a position

2. We are not sure whether No. 15 is encompassed within appellants' request for relief, since it may fall within the exception they have requested for residential and commercial rehabilitation which has already received approval.

where, once it has signed a multi-year contract providing for substantial funds for a project, it is proscribed from applying to that project the environmental analysis to which all other such contemporary projects are subjected, regardless of any flexibility that still might inhere in the planning process or of any feasible possibilities that may exist to achieve the same general goals with a more sensitive consideration of environmental factors.

Such a broad proposition finds no support in the statutes, regulations, legislative history or considerations of policy. While Congress could have specifically exempted approved but uncompleted projects from the requirements of NEPA, it did not do so. Neither did it make NEPA specifically applicable to such projects. But it did refer to, the "continuing responsibility" of the federal government to "use all practical means . . . to improve and coordinate Federal plans, functions, programs and resources", 42 U.S.C. § 4331, and to act "to the fullest extent possible", 42 U.S.C. § 4332, to carry out the policies of the act. And the "major Federal actions", 42 U.S.C. § 4332(2)(C), proposals for which necessitate careful environmental review, include, in the words of the overseeing Council on Environmental Quality, "projects and continuing activities . . . supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance". 36 Fed.Reg. 7724, § 5(a)(ii) (April 23, 1972).

Moreover, the legislative history is supportive of an environmental role for a federal agency so long as it remains meaningfully involved in a project. The Senate Report on the act states that the "[e]nvironmental management functions" required by 42 U.S.C. § 4332(2)(C) as "necessary to support the policies established" should be implemented "as a part of [a federal agency's] existing programs and [its] ongoing activities." S.Rep.No.296, 91st Cong., 1st Sess. 21 (1969).

Finally, sound public policy requires rejection of appellees' proposed rule that NEPA is per se inapplicable to projects already underway as of the passage of the act. Among the goals of NEPA is the "preservation and enhancement of the environment", 42 U.S.C. § 4331(c), for "present and future generations of Americans", 42 U.S.C. § 4331(a). To the extent that these long-range remedial objectives can be realized in continuing projects, it cannot be expected that Congress would foresake them without even a hint to that effect. While it may be fruitless to apply procedural protections afforded by NEPA to a project which has been so far terminated to preclude *any* change in plans, "the only correct interpretation would seem to be that if the requirements of the Act can feasibly be applied—even if the project in question was begun prior to the enactment of NEPA—then they should in fact be applied." Note, Retroactive Application of the National Environmental Policy Act of 1969, 69 Mich. L.Rev. 732, 743 (1971). Though such applications of NEPA have been called retroactive, *see, e. g.*, Natural Resources Defense Council v. Grant, 341 F.Supp. 356 (E.D.N.C.1972), they are in fact prospective since they seek to alter, within proper limits, the aspects of a proposal which have not yet been completed, and not to undo anything which has already proceeded to final construction. Thus, pursuant to the reasoning under facts virtually identical to those here, NEPA was properly applied to a HUD-financed project begun before 1970, but still continuing. Boston Waterfront Residents Ass'n v. Romney, 343 F.Supp. 89 (D.Mass.1972).

### III.

#### Applicability of NEPA in this Case.

The first, and basic question, is what are proper limits; what, in other words, can be regarded as prospective, and what not, but must fairly be regarded as vested. The purpose of

NEPA's section 4332(2)(C)'s impact statement is to guide and advise a federal agency in its decisional process. The statute is not a general empowering act. Unlike the Renegotiation Act, Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948), it is not an authorization to undo what has already been done, and the extent that Congress could do this is not our issue. Rather, the question must be what agency decisions are yet to be made, and what decisions, although already made, remain open to revision. Completion is not measured by counting bricks *in situ*; nor by measuring as yet unpaid federal aid. Nor do we have the comparatively simple problem of a purely federal project. *E. g.*, Environmental Defense Fund v. T. V. A., 468 F.2d 1164 (6th Cir. 1972). Commitments have been made to non-federal participants, as to whom, in the total mix, it would be inequitable to back out.

■ The district court's treatment of these questions was inadequate. We are all agreed that it adopted too narrow a focus in concluding that the execution of the contract in 1968 ended all possibility of future "major federal actions". It should have made detailed findings as to the control possible for HUD to exercise under the contract and as to the nature of federal project aid yet to come. It should also have supported with some analysis its conclusion that the two amendments to the contract since the advent of NEPA were not "major federal actions".

■ To take the latter point first, we know too little about the eight-fold increase in the relocation grant and the one-third increase in the loan authorization, to dismiss them, in the words of the court in San Francisco Tomorrow v. Romney, 472 F.2d 1021 (9th Cir. 1973), as "but confirmation of the Federal Government's earlier decision that the project proposal conformed to HUD requirements and was therefore eligible for a grant and loan." The availability of eight times as much money for relocation as had been anticipated is understandably asserted to have had environmental repercussions as to the phasing of the plan and the sociological mix of the neighborhood in that a quicker-than-planned eviction of larger numbers of area citizens is substantially altering the community balance. The large increase in the loan authorization is suggestive of an expanded undertaking.

In addition we are unable to assess the contractual rights of HUD, in terms of its present agreement, to affect the performance of the other contracting parties. We would be reluctant not to find a continuing major federal involvement so long as it was established that HUD retained any significant discretionary powers as might permit it to effect an alteration of building or design plans to enhance the urban living environment.

Perhaps the most important area of inquiry, from a realistic point of view, is what future federal participation can reasonably be anticipated. Appellants claim the presence of further contemplated federal action here which goes far beyond that in *San Francisco Tomorrow*. HUD has recently approved the applications for federal mortgage insurance for two buildings and has stipulated to the preparation of a modified impact statement as to these two parcels. It is maintained that applications for federal mortgage insurance are pending for two other planned edifices, and at oral argument BRA represented that virtually every new building will be the subject of similar applications. It does not appear that the district court considered the relevance of these contentions which, if true, would seem to call for a comprehensive study of the uncompleted aspects of the entire project as being most consistent with the object of evaluating the "cumulatively significant impact" of the anticipated federal role. 36 Fed.Reg., *supra* at 7725. And one initial comprehensive study, which could be referred to and supplemented by less comprehensive individual studies for each parcel, would appear to reflect a better use of

scarce resources. *See, e. g.,* Sierra Club v. Froehlke, 359 F.Supp. 1289 (S.D.Tex. 1973). In such a case it would not seem sensible to adopt the piecemeal approach which HUD seeks to adopt, whereby it will prepare a modified impact statement separately for each proposed construction as a mortgage insurance application is filed, an approach akin to equating an appraisal of each tree to one of the forest. If HUD is expected to be part of the financing of most of the unplanned and/or undeveloped parcels, it seems a perversion of NEPA for it to approach each parcel, wholly depending in its timing of environmental review on the filing of applications for assistance and considering anew the scene as it is changed by each subsequent approval. Not only would this be wasteful of bureaucratic resources, but the plurality of possible appeals would suggest a wasteful prolongation of time spent in litigation.

If the district court is to properly carry out the NEPA mandate, it must, if the planning reveals an expectation of substantial further federal assistance, order HUD to conduct an environmental study of the entire Fenway program under 42 U.S.C. § 4332(2)(C) with the goal of determining what changes can still be made and, just as important, of informing the members of the community and the public what the environmental impact will be, what adverse effects cannot be avoided, and what irretrievable commitment of resources are involved when any plan is fulfilled. *See, e. g.,* Arlington Coalition v. Volpe, 458 F. 2d 1323 (4th Cir. 1972); Morningside-Lenox Park Ass'n v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971); Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749 (E.D.Ark.1971); Environmental Defense Fund v. T. V. A., *supra;* Natural Resources Defense Council v. Grant, *supra;* Boston Waterfront Residents Ass'n v. Romney, *supra.*

At the same time, the majority of the court[3] does not recognize that future projects, if any, that contemplate no future federal assistance are obliged to come to a halt just because of the receipt of such prior to Congress' enactment of NEPA. The majority would distinguish the cases cited in the separate opinion. Indeed, the majority feels that F.H.A. v. The Darlington, Inc., 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), has been substantially miscited.

IV. Futility of a NEPA Statement.

Apart from the legal issue of NEPA's application, appellees claim that, even if the post-1970 amendments were major federal actions, if significant powers are reserved, or if major future federal participation is reasonably expected, any environmental study performed at this late date would not justify any additional delay. They point to the lengthy history of planning and public meetings and discount the representations of appellants as to the need for consideration of population density, traffic problems, mix of low, middle, and high income housing, and time phasing of the individual projects as constituting merely an effort to seek review of urban renewal issues already fully aired.

It may prove to be the case that an environmental review of so much of the project as may be subject to feasible alteration will yield few suggestions. But we hesitate to prejudge. The fact is that the planning focus had not had the environmental emphasis that NEPA has brought to the fore. Moreover, changes in the area, unforeseen in 1965 or 1967, have transpired, such as the alleged abandonment of plans for a major adjacent expressway. Were we to pass judgment on the possibilities for alteration in the Symphony Area segment of the Fenway plan mentioned by appellants as being irrelevant, trivial, or prohibitively expensive, we would be short-

---

3. The extent to which the writer of this opinion would go further is set forth in a concurring opinion. Because of the in-

terest in expedition, we have adopted this expedient rather than reassign the opinion to another member of the court.

cutting the process, which has been committed in the first instance to the responsible federal agency. Our responsibility here is to protect the integrity of the fact-finding process mandated by Congress in 42 U.S.C. § 4332(2)(C) and make certain that an environmental study is prepared and made available to the public as required by NEPA. In the words of Chief Judge Friendly, "preservation of the integrity of NEPA necessitates that the [agency] be required to follow the steps set forth in [§ 4332], even if it now seems likely that those steps will lead it to adhere to the present result." City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y.1972). See also Hanly v. Mitchell, 460 F.2d 640, 648 (2d Cir. 1972).

## V. Laches.

■ Appellees contend that NEPA was passed in 1970, that the Fenway Urban Renewal Project has been ongoing since 1967, and that we should therefore refuse to entertain appellants' request for injunctive relief at this late date. We see, however, important reasons for rejecting this defense of laches. First, appellants have alleged, without contradiction, that many aspects of the project which trouble them environmentally have only recently been discovered as there are claimed deviations from the original proposal. Second, one of appellants' major concerns is the increased relocation grant in August 1972, a federal action conceivably affecting various aspects of the entire project. Third, one of the main reasons why laches is recognized as a defense—the assumed prejudice to the party sought to be enjoined, see Environmental Defense Fund v. T. V. A., supra at 1182, cannot be said to exist here. As our prior discussion indicated, NEPA applies only so far as there exist reasonable alternatives to as-yet uncompleted parts of the project. The guidelines we will subsequently enunciate are intended to safeguard appellees from any prejudice which might otherwise result from the timing of this suit. Last, and most fundamental, however, is the observation of Chief Judge Friendly that the "tardiness of the parties in raising the issue cannot excuse compliance with NEPA; primary responsibility under the Act rests with the agency." City of New York, supra, 337 F.Supp. at 160. See also Arlington Coalition, supra, 458 F.2d at 1329–1330; Environmental Defense Fund v. T. V. A., supra at 1182. We see no reason for not following this rationale here.

## VI. Relief.

The task of accommodating the requirements of NEPA to this large and diverse project, where the stages of development of the various parcels range from completion to the absence of any detailed planning, requires imagination and flexibility on the part of HUD, BRA, other agencies and parties involved, and on the part of the court. In an effort to avoid heavy handed or unduly costly interference with those involved in the execution of the project, we set forth the following guidance.

1. The district court shall reexamine, make detailed factual findings, and set forth its conclusions of law on the following questions:

a. Were the post-1970 amendments, regarding the increase in relocation assistance and loan authorization, major federal actions?

b. To what extent, if any, do HUD's reserved powers under the basic contract involve the exercise of discretion in such a way as to enable it to alter in any significant way the course or timing of development?

c. Was there explicitly or by necessary implication a reasonable expectation of further major federal financial participation in order to bring the Symphony Area of the Fenway Project to completion?

2. If the answers to all three questions are negative, the prayer for injunctive relief should be denied and the project allowed to proceed.

3. If an affirmative answer is forthcoming to any of the three questions,

continuing work on the project should be enjoined, subject to the "escape hatch" provisions of paragraph 4, *infra*, pending the preparation and issuance of an environmental statement on the uncompleted part of the project conceived as a whole. The "mid-stream" character of the project dictates certain departures from normal operating procedure. While the district court is best qualified to tailor the requirement to the situation, we make the following suggestions:

a. Existing reports and studies should, where relevant, be utilized. While the old ground need not be plowed again, changes since 1967 affecting the area should obviously be taken into account.

b. The study shall not only be more limited in scope than would be the case if the basic agreement had not been signed and work begun, but it shall be foreshortened in time. Subject to the right of HUD to approach the district court to seek either a shorter or longer period, we think that HUD should be given 90 days to complete a draft environmental statement and that the statement be given, if possible, accelerated review. We note that HUD may request such accelerated review from the Council on Environmental Quality. 36 Fed.Reg., *supra* at 7726.

4. While all work on the Symphony Area of the Fenway Project shall be immediately enjoined, we authorize the district court, pending its decision on the merits, to release the injunction in the following instances:

a. As to those parcels where completion is near or where such binding commitments to a specific structure and purpose have been made such that changes in purpose, structure, or timing would work substantial injustice or public harm, the burden being on the defendants.

b. As to parcels where there is a showing that there is no continuing or likely federal involvement.

5. We continue the temporary stay of construction subject to further determination by the district court as to any individual situations which may call for modification of the stay order. Such decisions, as well as the district court's final order, will be appealable.

COFFIN, Chief Judge (concurring).

As stated in note 3, *supra*, I would go further than the majority. Even if it were to be concluded, with sufficient support, that the post-1970 amendments to the contract did not amount to "major federal action", that HUD possessed no significant retained powers under the contract,[1] and that future significant federal participation in the project was not reasonably anticipated, I would hold that the Symphony Area of the Fenway Project should be subjected to a restricted environmental review.

In City of Boston v. Volpe, 464 F.2d 254, 258 (1st Cir. 1972), we said that a project had not yet become sufficiently federalized so as to make the action of the local agency become federal action for purposes of NEPA because there existed no firm federal commitment of funds. It would therefore be anomalous to say that action on a project which has become federalized by such commitment ceases to be major federal action for purposes of NEPA upon that very com-

---

1. Two such powers, which may or may not be purely ministerial, would seem in particular to require not merely assertions by the contracting parties but such evidence of prior interpretation and invocation as might exist. One is the right to "monitor" the project, requiring, for example, HUD approval of BRA "proclamations" as to street, lighting, and sidewalk construction contracts, or FHA issuance of an allocation to a developer. The other is the opaque provision giving HUD the power to prevent BRA from "tak[ing] any steps which might in the opinion of the Secretary, violate Federal laws or regulations". Could HUD invoke this power if post-1970 fair labor or air quality standards were being violated, rather than leave enforcement to the Secretary of Labor, 29 U.S.C. § 201 et seq., or the Environmental Protection Agency, 42 U.S.C. § 1857 et seq.? If so, does NEPA fall in the same category of "laws or regulations"?

mitment. And in Silva v. Romney, 473 F.2d 287 (1973), we recognized that those in partnership with the federal government may be properly subjected to legislation or court action which might be inappropriate in matters of purely private concern.[2] This principle is not new, for "beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges . . . . [T]he Federal Government may establish and impose reasonable conditions relevant to federal interest in the project and to the overall objectives thereof." Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 295, 78 S.Ct. 1174, 1185, 2 L.Ed.2d 1313 (1958). Without the need for a precise definition of when partnership begins, there can be no doubt that here, as early as December 1967 when the original HUD-BRA contract was signed, those parties had commenced to operate as partners.

To assign such a label to this relationship does not settle the nature or extent of the parties' obligations. More precise analysis must be undertaken. Since, were it not for the participation of a non-federal partner, the obligation of HUD would be clear,[3] the real question is whether the BRA and those working on the Fenway Project can now be subjected to a duty of restraint during a review process which they did not foresee in 1967.

In urging a narrow construction of NEPA and the concept of partnership here, appellees contend that the Housing Act of 1949, under which HUD has financed this project, is similar to the recently adopted aid scheme of revenue sharing in the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221 et seq. (1973 Supp.), and that federal interference in the project after the grant is made is therefore unwarranted and detrimental to federal-state relations.[4] As a general proposition this argument misses its mark, for, most unlike revenue sharing, the Housing Act of 1949 establishes a categorical grant program which is the essence of partnership. In fact, the Secretary of HUD is empowered to "include in any contract or instrument made pursuant to [the act] such other covenants, conditions, or provisions . . . as he may deem necessary to assure that the purposes of [the act] will be achieved." 42 U.S.C. § 1456(c)(7). Such pervasive powers are inconsistent with appellees' reading of the act and description of the relationship between the parties. Moreover, in this case HUD was content only to include in amendments to the original contract a new anti-discrimination clause, but did not insert an environmental review clause. Were the obligation to conform to supervening national legislation to turn, as HUD urges, on the perspicacity of the contracting officer important national policies as to civil rights, labor, and environment could be easily thwarted, by design or inadvertence. Such fortuitous results are neither desirable nor consistent with a concept of partnership, which implies a reasonable reservation of powers in any federal-nonfederal contract to achieve vital national goals. *See infra.*

Appellees also allege, however, that whatever relevance the concept of part-

---

2. In referring to federal aid schemes as evidencing some sort of partnership, the writer has used a term virtually synonymous with "joint venture" used by the Supreme Court in Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 279, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), and identical with that used in Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013, 1027 (5th Cir. 1971).

3. It should be observed that if the project were a purely federal one, there would be no question but that it would be subject to some environmental review even though it had been commenced pre-NEPA and were well along toward completion. *See, e. g.,* Environmental Defense Fund v. T.V.A., *supra.*

4. It is not, however, the Commonwealth of Massachusetts but rather the local planning agency with whom HUD has contracted.

nership might have for projects commenced under post-NEPA contracts, the federal partner is precluded from imposing new duties upon its nonfederal partner for programs begun pre-NEPA. The sanctity of contract is claimed to be impaired if the project is enjoined until HUD can issue an environmental study. But whether NEPA is applicable here because there may be, as we have stated, additional major federal acts to be performed or because the Fenway Urban Renewal Project is the type of partnership to which the statute applies as a result of the existence of a federalized project denominated a "proposal" for a "major Federal action",[5] there can be no complaint rising to constitutional proportions. Thus, for example, where purely private contracts have been altered or abrogated by subsequent federal legislation, no constitutional cause of action has been found to lie.[6] Similarly, it is difficult to see how BRA can complain about being subjected to the significant requirement in NEPA that federally assisted programs reflect environmental planning in accordance with § 4332(2)(C). It cannot, I think, be gainsaid that where important and overriding public concerns are manifested in statutes like NEPA which are meant to

have sweeping application and which cannot be said to confer any primary benefits on the United States as a contract party, *cf.* Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935), compliance with these new laws is a necessary appurtenance to the partnership status of the nonfederal contracting party, whenever the partnership may have commenced.

One of the major legislative ends sought to be achieved by NEPA—the improvement of the "regulatory system" administered by each agency by requiring consideration of environmental factors at all stages of decision-making in federally assisted programs so as to preserve and improve the environment—is so important that "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." F.H.A. v. The Darlington, Inc., 358 U.S. 84, 91, 79 S.Ct. 141, 146 (1958). In that case the Court considered the application of a 1954 amendment to a 1946 housing act under which the federal government had contracted, in 1949, to provide mortgage insurance for an apartment house.[7] In finding that the new law, as applied to the old contract, was merely operating prospec-

---

5. *See* Environmental Defense Fund v. T.V.A., in which the court held that the continuing significant construction of the project causes that project to remain, for purposes of NEPA, a "proposal for action" until consummation. While that project was admittedly undertaken solely by a federal agency, the court's interpretation of "proposal" obviously has relevance for federal aid programs as well, where the concept and existence of "major Federal action" may be different.

6. *See, e. g.,* Philadelphia, Baltimore & Washington R.R. v. Schubert, 224 U.S. 603, 613, 32 S.Ct. 589, 56 L.Ed. 911 (1912) (Employers' Liability Act of 1908); United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 342, 17 S.Ct. 540, 41 L.Ed. 1007 (1897) and United States v. Southern Pacific Co., 259 U.S. 214, 234–235, 42 S.Ct. 496, 66 L.Ed. 907 (1922) (Sherman Anti-Trust Act); Ball v. Halsell, 161 U.S. 72, 16 S.Ct. 554, 40 L.Ed. 622 (1896) and Cal-

houn v. Massie, 253 U.S. 170, 40 S.Ct. 474, 64 L.Ed. 843 (1920) (federal regulation of champerty).

7. *The Darlington* dealt with a statute which expressly provided for its application to pre-existing contracts. *See also,* e. g., Lichter v. United States, 334 U.S. 742, 787–789, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948). But as it was not necessary for Congress to have explicitly stated its intent that NEPA affect pre-NEPA contracts—since in imposing new obligations on the federal government and its contractual partners NEPA makes no "exceptions *of existing contracts*", Louisville & Nashville R.R. v. Mottley, 219 U.S. 467, 479, 31 S.Ct. 265, 55 L.Ed. 297 (1911) (emphasis in original), reference to *The Darlington* here is meant to address appellees' constitutional arguments that application of NEPA to the entire Fenway Project somehow unlawfully interferes with BRA's pre-existing contract rights.

tively, the Court stated that "[f]ederal regulation of future action based upon rights previously acquired by the person regulated is not prohibited by the Constitution. . . . Immunity from federal regulation is not gained through forehanded contracts." *Id.* at 91, 79 S. Ct. at 146. BRA, like the owners of the apartment house in *The Darlington,* has received and continues to receive the benefits of federal funding, and it is hard to find any valid reason for its failure to recognize its obligations to aid its federal partner in carrying out the mandate of NEPA. In fact, the continuing federal role here would seem to be much greater than that in *The Darlington. See also* Shannon v. HUD, 436 F.2d 809, 817 (3d Cir. 1970), where in view of the important concerns reflected in the 1968 Civil Rights Act, the court read that law as imposing certain conditions on HUD and its partner which had, prior to 1968, entered into a contract for a federal mortgage insurance guarantee.

I also find unpersuasive HUD's confession of an absence of power to effectuate any suggestions for change resulting from its NEPA study or other remedial avenues open to it. In the event that it interprets its specific contractual authority too narrowly to enable it to cope with the situation, it is possible that HUD or others who seek to vindicate the goals of NEPA will have available sufficient remedies, if and when the need arises, which may be found in the nature of the legislative scheme, Textile Workers v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), here perhaps in the area of environmental law, *see* Illinois v. City of Milwaukee, 406 U.S. 91, 93, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), or in the area of federal housing legislation, *see, e. g.,* Shannon v. HUD, *supra,* 436 F.2d at 822, or even as related to the obviously pervasive contracting power of the United States, *see, e. g.,* United States v. Carson, 372 F.2d 429 (6th Cir. 1967), and United States v. Stadium Apart-

ments, Inc., 425 F.2d 358 (9th Cir. 1970).

In the NEPA context, for example, a problem might arise where a federal-nonfederal partnership was engaged in a ten year construction project requiring an initial NEPA statement and periodic updates. If, in the eighth year, a study showed that an uncompleted portion would be environmentally unwise and that it should not be built, it is inconceivable that just because federal money had changed hands years ago, the United States would be without any remedy should its nonfederal partner resist alterations.

I would therefore have preferred to direct that an injunction issue, subject to "escape hatch" clause 4a of the section entitled "Relief", without the findings required by the majority.