**NATIONAL WILDLIFE FEDERATION,**
Appellant,

v.

**APPALACHIAN REGIONAL
COMMISSION, et al.**

No. 79–2349.

United States Court of Appeals,
District of Columbia Circuit.

Argued 26 Nov. 1980.

Decided March 19, 1981.

Charles H. Montange, Washington, D. C., with whom David G. Burwell, Washington, D. C., was on the brief for appellant. Russell H. Carpenter, Jr., Washington, D. C., also entered an appearance for appellant.

James T. Draude, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen. and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellee, Federal Cochairman.

Robert L. McCloskey, Washington, D. C., for appellee, Appalachian Regional Commission.

Before BAZELON, Senior Circuit Judge, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

The major issue presented on this appeal is whether the National Environmental Policy Act of 1969 (NEPA) requires a *programmatic* environmental impact statement for an ongoing, but mostly completed, federally assisted highway development project. The highways in question were conceived in 1965, well before the passage of NEPA, and are now in place, under construction, or planned throughout the thirteen states constituting Appalachia. *Site-specific* environmental impact statements, on the other hand, have been, or are being prepared now for about 80 percent of these Appalachian highways. Any and all of the remaining individual highway projects will be constructed or approved subject to such environmental impact statements.

Under these facts, where the program decisions were outlined long ago in the Appalachian Regional Development Act of 1965 (ARDA), and where that outline has already been substantially implemented, we conclude that a programmatic environmental impact statement would be largely retrospective. Its preparation, therefore, would not be necessary to satisfy the "rule of reason" generally applicable to NEPA procedures. A programmatic evaluation at this late date would not shed additional decisionmaking light on the interstitial and disparate highway segments still to be built. We affirm the district court's decision granting summary judgment in favor of appellees on cross-motions for summary judgment.

## I. APPELLANT'S CLAIMS

Appellant, the National Wildlife Federation, asserted five different grounds before the district court challenging ARDA highway construction.[1] The claims allege noncompliance with NEPA's requirements of environmental impact statements (EIS) and consideration of environmental "alternatives" for "major Federal actions significantly affecting the quality of the human environment."[2] Three of the claims dropped out of the case because the intervening Supreme Court decision in *Andrus v. Sierra Club* was contrary and directly on point.[3] In *Sierra Club*, the Court considered a federal agency's obligation to prepare an EIS when it takes a "new look" at some previously proposed action in connection with a budget appropriation request to Congress. The Court held that the agency actions considered were not "proposals for legislation" under section 102(2)(C) of NEPA,[4] and therefore did not trigger the EIS requirement.

---

1. *See* Memorandum Opinion (Mem. op.), Civil Action No. 78–1913 (D.D.C. 14 Sept. 1979) at 3–4, *reprinted in* Joint Appendix (J.A.) at A3–A4. Our disposition of this case turns on our interpretation of the undisputed factual setting presented here. Drawing conclusions and legal inferences from facts is the occupation of the trial court, in the first instance. Under these circumstances, however, we believe our factual determination is appropriate and an exercise of sound judicial administration.

2. NEPA, § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1976). *See also id.* § 102(2)(E), 42 U.S.C. § 4332(2)(E).

3. 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979).

4. 42 U.S.C. § 4332(2)(C) (1976).

Appellant also claimed, however, that legislation drafted by appellees and passed along to Congress in 1978 and 1979 did constitute "proposals for legislation" calling for the preparation and submission of an EIS. Legislation related to appellees' draft suggestions that funding for Appalachian development be continued was in fact introduced and enacted by both Houses of the 96th Congress.[5] The legislation, however, never became public law as the second and final session of the 96th Congress closed without the two Houses resolving their differences. We find that the rationale we follow below is equally true with respect to proposals considered by Congress in 1978 and 1979. Therefore, we reject appellant's claim based on these proposals. We find that the same factual considerations obviating a programmatic EIS now also obtained then. After all, the data on which we rely here lag behind the state of construction in 1981 by about two or three years. Moreover, claims for environmental review grounded in the dead legislative proposals are arguably moot. The proposals do not, of course, carry-over into the 97th Congress; furthermore, the dynamic nature of this highway system may render these obsolete legislative proposals "incapable of repetition."

Hence we consider appellant's remaining claim: whether appellees are under a continuing obligation to prepare a programmatic EIS for the Appalachian Development Highway System (ADHS) designed originally in 1965.

Appellees, the Appalachian Regional Commission (ARC) and its Federal Cochairman, contend that they are not an "agenc[y] of the Federal Government" within the meaning of NEPA's section 102.[6] They claim that it is the Federal Highway Administration, not ARC, which is legally responsible for, and is in fact, complying with NEPA.[7] The district court did not reach this defense. In view of our resolution of this case, we likewise do not decide whether these appellees may be sued to enjoin compliance with NEPA.

The district court found for appellees on different but related grounds. It found that the statutory requirements of ARDA and NEPA were in direct conflict. The court held that ARDA relieved ARC itself of any burden for reconciling ARDA projects with other federal laws.[8] Thus the district court dismissed the case, holding that NEPA does not apply to ARC or its Federal Cochairman (at least, for so long as the Federal Highway Administration's efforts under NEPA continue). We also find it unnecessary to decide this question of interstatutory conflict arguably exempting ARC and its officials from incompatible NEPA procedures.

We choose to analyze appellees' NEPA obligations exclusively on the basis of the particular facts at hand. Specifically, we recognize that ADHS construction is part of an overall *program* which, if proposed today, would presumably occasion the programmatic EIS appellants seek here (as well as site-specific EISs). However, we observe a highway system well beyond the nascent stage, and for which, as a practical matter, ongoing environmental evaluations may have to be limited in scope. For these reasons, the following statement of the salient facts is critical in providing the basis for our disposition.

---

5. Different versions of the National Economic Development and Public Works Act of 1979 were actually passed by both the Senate and the House of Representatives. *See* 125 Cong. Rec. S11059–S11106 (biweekly ed. 1 Aug. 1979) (debating and passing S.914); 125 Cong.Rec. H10662–H10745 (biweekly ed. 14 Nov. 1979) (debating and passing H.R. 2063). These bills contained provisions addressing Appalachian development. Conferees were then appointed from both Houses, and a conference was held

on 13, 14 and 20 December 1979. No further *action on the bills was taken by Congress prior* to its adjournment.

6. 42 U.S.C. § 4332 (1976).

7. *See* 40 U.S.C.App. 223 (1976).

8. *See* Mem. op. at 5–9, *reprinted in* J.A. at A5–A9.

## II. BACKGROUND

### A. Short History of the Appalachian Highways

In the early 1960's the governors of the thirteen Appalachian states[9] requested that President Kennedy appoint a commission to recommend programs for the region's economic development. On 9 April 1963 the President's Appalachian Regional Commission was formed and a year later it submitted its report to President Johnson. Among the many other problems troubling the region, the report identified regional isolation as a primary factor in Appalachia's depressed economic environment. The report recommended construction and upgrading of highways to connect isolated areas throughout the region. Proposals for highway locations and estimated mileages were also included within the report.

The efforts of the President's Appalachian Regional Commission soon came to fruition when Congress enacted the Appalachian Regional Development Act of 1965 (ARDA).[10] ARDA established an Appalachian Regional Commission (ARC) comprised of the thirteen governors plus a Federal Cochairman to be appointed by the President.[11] ARDA authorized, among various other remedial programs, a program for highway construction throughout the approximately 197,000 square miles of Appalachia.[12] The highways were to be undertaken pursuant to Title 23 of the United States Code. ARDA delegated to ARC, the governors and the Federal Cochairman, the responsibility for submitting recommendations and criteria for regional highway building to (what is now) the Federal Highway Administration in the Department of Transportation.[13] On 12 May 1965 ARC submitted its recommendation of criteria to be applied to the construction of Appalachian development highways. Over the course of the next year and a half, ARC suggested general corridor locations for the prospective highways. Thus, as early as 1966 there existed a rudimentary outline for approximate routes and termini of the roads which were to tie the region together. After that, the states, acting through ARC, have designated participating roads and applied to the federal government for development highways. The Federal Highway Administration then approved applications for the highway construction according to the criteria of Title 23 and other federal laws. ARDA provides that the federal government shall pay up to 80 percent of the building costs for the Appalachian highway projects; and, the federal government appropriated funds for a maximum of 3,025 miles of ADHS highways through fiscal year 1981.[14] By this means Congress has cooperated with the states by subsidizing cohesion and economic development in the Appalachian region.

### B. Current Status of the Appalachian Highways

Since ARDA was enacted in 1965 there has been considerable construction of the ADHS highways then planned for the thirteen Appalachian states. As of 15 May 1979, about twenty months ago, 56 percent of the authorized 3,025 miles of roads had been completed all over Appalachia, or were actually under construction.[15] These figures themselves may be out of date by now as highway building goes on.[16] The highways can be found, of course, dispersed throughout the 197,000 square miles of Ap-

9. See 40 U.S.C.App. § 403 (1976). The states are: Alabama, Georgia, Kentucky, Maryland, Mississippi, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.

10. Pub.L.No.89–4, 79 Stat. 5 (9 Mar. 1965), as amended, 40 U.S.C.App. § 1 et seq.

11. 40 U.S.C.App. § 101(a) (1976).

12. Id. § 201 (1976).

13. Id.

14. Id.

15. See S.Rep.No.96–171, 96th Cong., 1st Sess. 12 (15 May 1979) (accompanying S. 835, proposing, inter alia, amendments to ARDA).

16. Compare id. (status as of 15 May 1979), with Brief for Appellee Federal Cochairman at 11 (status as of 30 Sept. 1978).

palachia. There are still some significant highway fragments that must be built to realize a fully integrated Appalachian system. The remaining roads are similarly scattered throughout the vast region. In fact, as of 30 September 1978 status maps introduced at trial by the appellees demonstrated the utter fragmentation of remaining construction sites.[17] The maps display a color-differentiated, schematic breakdown of the patch-work of highways comprising the Appalachian system: they indicate those pre-1965 roads which were deemed adequate, and how the new ARDA development highways were to be meshed with old roads. The maps evince beyond a graphic doubt that the planned but unbuilt highways at issue here only fill in disjointed gaps left in a highway network thoroughly defined now by old roads in place plus new roads already completed or under construction.

The interstitial, pre-construction highways that concern us are themselves the subject of considerable background planning, even though placement for the new roads is of course constrained by the existence of built roads to which the new must attach and connect. Nevertheless, at a minimum, "location studies" considering specific routes and termini are underway or completed for all of the remaining highways in the Appalachian system. As of 30 September 1978 about 703 miles of planned highway had made only this amount of progress.[18] The rest of the remaining unbuilt highways are even further along: about 258 miles have reached the "design" stage, while for another approximately 274 miles the "rights-of-way" have either been completely acquired or are in the process of being acquired.[19]

What is evident from a look at that map is that the program structure encompassing all the Appalachian highways is taking shape. Also evident, moreover, is that as of 1979 the roads still left were scattered "all over the map"—each remaining road project could be fairly characterized as a residual insertion to be pieced into more advanced sections of the total structure. The geographic diversity of the remaining segments follows naturally from the fact that the "old" roads and the "new" roads constructed between ARDA's enactment in 1965 and the filing of this lawsuit in 1978 were themselves built section-by-section everywhere throughout the 197,000 square miles of the thirteen states. As the later segments are essentially connective, they must fill in widely separated lacunae wherever they occur in order to finish off the network. Hence the remaining segments are really independent *from each other.* In other words, where one new road will be built is not relevant to where some other new road will be built, but rather, each pertains only to the old roads around it.

Environmental evaluation is available for the Appalachian system. Site-specific EISs will soon be completed for the overwhelming majority of ADHS roads.[20] The process of review for environmental impacts in the area continues for the remaining projects. On this background, we now turn to the legal issue in the case: whether NEPA requires a programmatic EIS under circumstances where the highway-system-building die has been cast, and particularly where "[s]ubstantial construction had taken place prior to the passage of [NEPA]."[21]

## III. REQUIREMENT OF PROGRAMMATIC EIS UNDER NEPA

*Two* distinct tiers of environmental review may be applicable to some "major Federal actions." Site-specific EISs constitute a second tier in the discussion and analysis of impacts on the environment. This appeal, of course, concerns the applicability of first tier review of an overall "major Federal action" *in medias res.*

---

17. *See* Defendants' Exhibits B & C. Submitted to this court as an attachment to the Joint Appendix.

18. *See* Mem. op. at 2, *reprinted in* J.A. at A2.

19. *See id.*

20. *See id.*

21. *Id.*

"The first tier EIS should focus on broad issues such as mode choice, general location and areawide air quality and land use implications of alternative transportation systems."[22] A programmatic EIS reflects the broad environmental consequences attendant upon a wide-ranging federal program. The thesis underlying programmatic EISs is that a systematic program is likely to generate disparate yet related impacts. This relationship is expressed in terms of "cumulation" of impacts or "synergy" among impacts that are caused by or associated with various aspects of one big Federal action.[23] Whereas the programmatic EIS looks ahead and assimilates "broad issues" relevant to one program design, the site-specific EIS addresses more particularized considerations arising once the overall program reaches the "second tier," or implementation stage of its development. In evaluating a comprehensive program design an agency administrator benefits from a programmatic EIS which indubitably "promote[s] better decisionmaking."[24] What benefits are available from a programmatic EIS in this case, and whether they rise to a level invoking the obligatory procedural strictures of NEPA determine our outcome here.

## A. Programmatic EISs in General

### 1. Program decisions.

The Supreme Court has held that the environmental consequences of proposed actions must all be considered together in a single, programmatic EIS when their impacts will have a compounded effect on a region.[25] "Cumulative environmental impacts are, indeed, what require a compre-

hensive impact statement."[26] In other words, if the "major Federal action" at issue consists of a number of related enterprises associated within a single program and planned together, then their joint effects should probably also be considered together. This proceeds from the requirement that the scope of the federal action be accurately characterized to ensure that an EIS of equivalent scope is prepared.[27] Consequently, a *multi-phase* federal program like a major highway development is a probable candidate for a programmatic EIS. In fact, Council on Environmental Quality guidelines provide that in the case of "a large-scale program or chain of contemplated projects (e.g., major lengths of highway as opposed to small segments)," the responsible officials shall prepare a "broad program statement[ ]."[28]

### 2. Agency discretion.

 The proper scope of an EIS and the corollary decision whether to prepare a programmatic EIS at all are matters initially committed to agency discretion.[29] The Supreme Court has held that determining need for programmatic environmental consideration is within the province of agency expertise:

> The determination of [effects on] the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility.... Absent a showing of arbitrary action, we must assume that the agencies

---

**22.** 44 Fed.Reg. 56,420 (1 Oct. 1979) (Department of Transportation order implementing Council on Environmental Quality's (CEQ) new NEPA regulations), *quoted in* Reply Brief for Appellant at 16 n.1.

**23.** *See* note 26 *infra* and accompanying text.

**24.** *See* Reply Brief for Appellant at 16 n.1, quoting Letter from Nicholas Yost, CEQ General Counsel, to Martin Convisser, Department of Transportation, dated 29 October 1979.

**25.** *See Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976).

**26.** *Id.* at 413, 96 S.Ct. at 2732.

**27.** *See Aberdeen & Rockfish R. Co. v. SCRAP (SCRAP II)*, 422 U.S. 289, 322, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1975).

**28.** 40 C.F.R. § 1500.6(d)(1) (1979).

**29.** *See Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976).

have exercised this discretion appropriately.[30]

Agency decisions setting limits to the scope of their environmental review are therefore rightfully guided by the so-called "rule of reason" applicable to administrative compliance with NEPA.[31] Courts are thus under the correlative constraint to uphold an agency's environmental vision which is neither arbitrary nor capricious.

Since environmental review, and in particular the EIS, is essential as part of the administrative decisionmaking process,[32] *relevance at the planning stage* is the measure of agency reasonableness for preparing EISs.[33] Two considerations are especially helpful in reviewing the responsible officials' decision not to prepare a programmatic EIS: (a) Could the programmatic EIS be sufficiently forward looking to contribute to the decisionmakers' basic planning of the overall program? and, (b) Does the decisionmaker purport to "segment" the overall program, thereby unreasonably constricting the scope of primordial environmental evaluation?

█ *a. Forward looking.* In a case where the Department of Housing and Urban Development had proposed to add 207 new housing units to the 489 units previously constructed for a 696-unit housing project in Boston's South End, the First Circuit upheld that agency's refusal to prepare an EIS for the remaining units whose addition would merely complete the overall program. The court wrote:

> Since the basic function of an EIS is *to serve as a forward-looking instrument* to assist in evaluating "proposals" for major federal action, *Kleppe v. Sierra Club*, 427 U.S. 390, 406, 410 n.20, 96 S.Ct. 2718, 2728, 2730 n.20, 49 L.Ed.2d 576 (1976), I decline, absent a showing of bad faith, to require an EIS as an *after-the-fact justification* for a multi-phase development already substantially completed. Any incremental effects of th[is] phase have already been adequately assessed in the [Special Environmental Clearance study], as supplemented.[34]

As we can see from Judge Wyzanski's opinion for the court, the need for an EIS analyzing "incremental effects" attributable to a later phase of a federal action depends on the temporal context of the whole project. Where, for instance, substantial construction of a project has already been realized, the "forward-looking" criterion suggests that where new construction is necessary to finish off work already done, that new work does not then trigger an obligatory EIS evaluating program-wide effects.[35] NEPA procedures including impact statements are not applied retrospectively to completed projects whose status

---

30. *Id.*

31. *See North Slope Borough v. Andrus*, 642 F.2d 589, 600 n.47 (D.C.Cir.1980); *Alaska v. Andrus*, 580 F.2d 465, 475 (D.C.Cir.), *vacated in part as moot*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978); *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

32. *See* 42 U.S.C. § 4332(2)(A) (1976).

33. *See Andrus v. Sierra Club*, 442 U.S. 347, 350–51, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979).

34. *Aersten v. Landrieu*, 637 F.2d 12, 19 (1st Cir. 1980) (emphasis added). The court in *Aersten* found that there was no evidence of "conscious design to circumvent the requirements of NEPA as would amount to bad faith." *Id.* (quoting *Ogunquit Village Corp. v. Davis*, 553

F.2d 243, 246 (1st Cir. 1977). It is also difficult to visualize any "bad faith" present in our case where the program was designed prior to NEPA and where, in addition, each new highway project added to complete the Appalachian system carries its own individual EIS.

35. An agency also has substantial discretion regarding the moment at which it prepares its environmental study. "The obligations of timeliness under NEPA, after all, must be read in light of the same 'rule of reason' that applies to obligations of content and analysis under NEPA." *Realty Income Trust v. Eckerd*, 564 F.2d 447, 454 (D.C.Cir.1977). Of course an agency may not so delay the preparation of a programmatic EIS that the document could no longer have any useful decisionmaking function. This would be an unreasonable, hence unlawful, evasion of NEPA. *See* Part III. A. 2. b. *infra.*

within the program is well beyond change.[36] In sum, we see that when a NEPA challenge is leveled against some subsequent phase of a continuing federal action, the EIS obligation attaching at this latter point is realistically qualified by the elements of the program already in place. This limitation simply confines NEPA's mandatory decisionmaking input to programs posing options that may still freely be chosen.

*b. Program segmentation.* Quite simply, "[s]egmentation of a large or cumulative project into smaller components in order to avoid designating the project a major federal action has been held to be unlawful."[37] We assume this same proscription would apply if an agency sought to evade its NEPA responsibility to consider programmatic environmental impacts. The existence of a comprehensive program with cumulative environmental effects cannot be escaped by disingenuously describing it as only an amalgamation of unrelated smaller projects. However, over time, without any invidious intention of the decisionmakers other than to finish the plan, a once vast and variegated program can become reduced to a few uncompleted, smaller-scale enterprises. Building of these penultimate projects commences too late in the day to color the program design. In such case it would be meaningless to impose the requirement of a programmatic EIS on late projects that can only follow along in the pattern established some time before. Whereas individual late projects can even be rejected altogether, programmatic review is untimely given that the program's pattern of development cannot be done out of existence.

In one highway case, the Seventh Circuit *en banc* considered whether the prior construction of a three-and-one-half mile section to be incorporated within a proposed forty-two mile highway justified partial environmental review of only one fifteen mile segment also planned as a part of the total highway.[38] The court held that the "logical length" of road was the full forty-two miles for which an overall EIS must be prepared. The rationale of *Swain v. Brinegar*[39] applies in the instant case, though our outcome is different because of the material differences in the facts of both cases. The Seventh Circuit focused on the fact that the short, three-and-one-half mile segment was right in the middle of the full length of the highway. Hence the prior existence of this median section *did not* limit choices for where the northern and southern segments of the road might eventually be built. Otherwise put, the built road in *Swain v. Brinegar* had not yet laid in place the inevitable pattern of road design for the entire highway. But in our case the constructed roads do show a pattern; they are both (a) more substantial in mileage, and (b) more geographically pervasive.[40]

Similarly, in *Indian Lookout Alliance v. Volpe*,[41] the Eighth Circuit viewed the question of environmental review of highway construction in terms of how existing road sections committed the decisionmakers to particular choices for future road building within a program. "[T]he problem," identified in *Indian Lookout Alliance*, is "that the construction of a small segment [of highway] after a limited impact statement could

---

**36.** *See City of Romulus v. County of Wayne*, 634 F.2d 347, 347 (6th Cir. 1980) ("The activities which plaintiffs seek to enjoin are over, and we are not in position to prevent what has already occurred.")

**37.** *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 240 (3d Cir. 1980) (footnote omitted).

**38.** *See Swain v. Brinegar*, 542 F.2d 364 (7th Cir. 1976) (*en banc*) (4–3).

**39.** *Id.*

**40.** The facts in *Swain v. Brinegar* satisfactorily explain the outcome there. The dissent in that

case, however, did note the constraining function of the previously constructed median segment. Judge Tone, writing for himself and two other dissenting judges, recognized that the northern and southern segments would have to connect up with "section 'B'." "But section 'B' does exist," he wrote, "and no one suggests that it will not be utilized, whatever route is selected for the [full 42-mile] freeway between Peoria and Lincoln." *Id.* at 376 (Tone, J., dissenting).

**41.** 484 F.2d 11 (8th Cir. 1973).

set the course or pattern for a considerable portion of the system so that little flexibility would be left in the later stages of the system's implementation ...." [42] Once again, we accept this analysis, but our outcome is different only because our facts depict a highway development "in the later stages of the system's implementation," leaving "little flexibility."

Finally, the arbitrary and capricious standard also applies to segmentation of environmental review that avoids overall, programmatic evaluation. Referring to four spatially distinct forests all in East Texas, the Fifth Circuit held that no programmatic EIS was required for federal action with respect to these geographically dispersed tracts in the national forest land.[43] The court, citing *Kleppe v. Sierra Club*, wrote that the "[p]laintiffs have failed to show arbitrary action in preparing [only] individual impact statements for the relevant forests." [44]

### B. *A Programmatic EIS Is Not Required in this Case*

Our decision to affirm the district court's judgment in favor of the Appalachian Regional Commission and its Federal Cochairman is strengthened by the total *absence* of *arbitrary* action or action in *bad faith* which might explain why environmental review is limited to site-specific EISs for the remaining ADHS projects. After *Kleppe v. Sierra Club*, and other cases cited above, we could not reverse unless there were persuasive evidence that an agency acted arbitrarily in refusing to prepare a

programmatic EIS.[45] Moreover, in *Kleppe v. Sierra Club* the Supreme Court acknowledged that obliging agencies to undertake the preparation of unnecessary EISs was itself improper.[46] The Court made its understanding perfectly clear as it emphasized the *"[e]ven if environmental interrelationships could be shown* conclusively to extend across basins and drainage areas, *practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements."* [47] We hold that the preparation of site-specific EISs in connection with the Appalachian highways, as the system currently stands, is sufficient compliance with NEPA.[48]

Naturally, we recognize that NEPA applies to a continuing federal action even though the plan to build a broad network of highways was conceived prior to NEPA, so long as considerable implementation remained after the statute's effective date on 1 January 1970.[49] Equally significant, however, is the reality posed by the facts we have recited earlier. The Appalachian highways have simply reached such a stage of completion that the programmatic EIS requirement can no longer practically apply.[50]

The approximately seventeen hundred miles of decentralized highway construction in Appalachia represents too much of the jigsaw puzzle for us to ignore the pattern of highways unfolded throughout the region. At this stage only individual new pieces of road can be ruled out of the overall system. Policy decisions delineating the basic network of roads were made and acted upon

**42.** *Id.* at 14.

**43.** *See Texas Comm. on Nat. Resources v. Bergland,* 573 F.2d 201 (5th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978).

**44.** *Id.* at 211.

**45.** 427 U.S. at 412, 96 S.Ct. at 2731.

**46.** *See id.* at 406, 96 S.Ct. at 2728. An attack on the sufficiency of an EIS actually prepared would be an entirely different matter. *Cf. id.* at 408, 96 S.Ct. at 2729.

**47.** *Id.* at 414, 96 S.Ct. at 2732. (emphasis added).

**48.** *See Environmental Defense Fund v. Adams,* 434 F.Supp. 403, 408 (D.D.C.1977) (programmatic EIS may not be necessary where second tier, site-specific EISs address local and regional impacts).

**49.** *See Arlington Coalition on Transp. v. Volpe,* 458 F.2d 1323, 1330–31 (4th Cir. 1972). *See also Jones v. Lynn,* 477 F.2d 885, 888–89 (1st Cir. 1973).

**50.** *See id.*

years ago. Hence, to require a programmatic EIS now would be a vain attempt to inform decisionmaking past.[51] It could not be said that a programmatic EIS here was "relevant to policy and . . . timed to coincide with meaningful points in agency planning and decisionmaking."[52]

NEPA's provision for impact statements[53]

is not an authorization to undo what has already been done . . . . Rather, the question must be what agency decisions are yet to be made, and what decisions, although already made, remain open to revision. Completion is not measured by counting bricks *in situ* ; nor by measuring as yet unpaid federal aid. Nor do we have the comparatively simple problem of a purely federal project. . . . Commitments have been made to non-federal participants, as to whom, in the total mix, it would be inequitable to back out.[54]

This interpretation of NEPA provided by the First Circuit is compelling.

### C. Appellant's Claim Under Section 102(2)(E) of NEPA

■ Appellant presses a further claim based solely on NEPA's section 102(2)(E).[55] Appellant alleges that appellees violated

that section by failing to study or develop *alternatives* to the proposed highways. We do not find it necessary to decide here whether this section provides, in general, a separate cause of action to ensure compliance with NEPA by federal decisionmakers. Instead, in light of our rationale above regarding the futility of a backward looking programmatic EIS, we hold only that where EISs have been prepared, as here, judicial review may be adequately accomplished via section 102(2)(C)(iii) of NEPA. That section provides that the impact statement itself shall include "alternatives to the proposed action."[56] Presumably, where section 102(2)(C)(iii) applies, NEPA mandates that agencies will study and discuss alternatives. There is no suggestion in this case that section 102(2)(C)(iii) does not apply. However, the sufficiency of site-specific EISs actually prepared is not an issue in this case.[57]

## IV. CONCLUSION

For the reasons stated above, the district court's grant of summary judgment for appellees is hereby

*Affirmed.*

**51.** *See Ogunquit Village Corp. v. Davis,* 553 F.2d 243, 245 (1st Cir. 1977) (NEPA not usually applied to "projects on which construction has been completed or on which work has progressed so far that meaningful future federal decisionmaking has been foreclosed"). *See also Jones v. Lynn,* 477 F.2d 885, 889 (1st Cir. 1973) (may be fruitless to apply NEPA where project is so far along as to preclude change of plans).

**52.** 40 C.F.R. § 1502.4(b) (1979) (CEQ regulation on programmatic EISs). *Cf. Realty Income Trust v. Eckerd,* 564 F.2d 447, 458 (D.C. Cir.1977) (NEPA assessment must be in light of realities of situation).

**53.** 42 U.S.C. § 4332(2)(C) (1976).

**54.** *Jones v. Lynn,* 477 F.2d 885, 890 (1st Cir. 1973).

**55.** 42 U.S.C. § 4332(2)(E) (1976).

**56.** Id. § 4332(2)(C)(iii) (1976).

**57.** *See Aersten v. Landrieu,* 637 F.2d 12, 20 n.9 (1st Cir. 1980). One possibility is that § 102(2)(E) may direct decisionmakers to consider environmental alternatives in cases where the proposed action does not quite rise to the level of a "major Federal action" and, does not, therefore, trigger the EIS requirement. *Cf. Trinity Episcopal School v. Romney,* 523 F.2d 88, 93 (2d Cir. 1975). *See Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 225, 228, 100 S.Ct. 497, 498, 500, 62 L.Ed.2d 433 (1980) (*per curiam* ). In this latter case, the Supreme Court reversed the Second Circuit in *Karlen v. Harris,* 590 F.2d 39 (2d Cir. 1978) (*Karlen v. Harris* was the same case as *Trinity Episcopal School, supra,* when it came back up to the Second Circuit after remand). The Second Circuit had found that the Department of Housing and Urban Development's proposed action did not require the preparation of an EIS under § 102(2)(C). Nevertheless, that court held that HUD had failed to consider alternatives under § 102(2)(E). The Supreme Court, however, reversed in favor of HUD stating that environmental alternatives had been adequately considered.