Liliane **WILSON** et al., Plaintiffs,

v.

James T. **LYNN** et al., Defendants.

Civ. A. No. 74–392–S.

United States District Court,
D. Massachusetts.

March 22, 1974.

Robert Y. Murray, Boston, Mass., for plaintiffs.

Clarence Dilday, William A. Brown, Asst. U. S. Atty., J. W. McCormack, Pa-

trick E. Clancy, Charles J. Speleotis, Betty Cherry Kaufman, U. S. Dept. of Housing and Urban Development, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

SKINNER, District Judge.

The original complaint in this case was filed on January 31, 1974. The plaintiff's application for a temporary restraining order was heard on the same day and denied. An amended complaint was filed on February 7, 1974. The plaintiffs are residents of Boston and either owners of or tenants in property located within the South End Renewal Plan area. The defendants James T. Lynn, James J. Barry, and M. Daniel Richardson are officials of the United States Department of Housing and Urban Development and are hereinafter collectively referred to as "HUD." The Boston Redevelopment Authority was named in the original complaint but not in the amended complaint as a defendant. Subsequently, it was permitted to intervene and will hereinafter be referred to as "BRA." Tenants' Development Corporation, hereinafter referred to as "the Developer," was also permitted to intervene.

Testimony was taken on the plaintiffs' application for a preliminary injunction on February 11, 12, and 13, 1974. Arguments were heard on February 25, 1974, and briefs were filed on March 6, 1974. In the course of the hearings the Court, with the assent of all the parties, ordered the hearing on the merits advanced and consolidated with the hearing on the application for a preliminary injunction in accordance with the Federal Rules of Civil Procedure, Rule 65(a)(2).

■ Also on March 6, 1974, Joan Wood and Joshua A.S. Young, who allege that they also are residents of the South End Renewal Plan area, moved to intervene for the purpose of challenging the plaintiffs' allegation that they represent a class consisting of such residents. The plaintiffs offered no evidence tending to show that they fairly represented such a class, and I therefore find and rule that this action is not entitled to be maintained as a class action. The motion of Joan Wood and Joshua A.S. Young to intervene is therefore denied.

### Count One

The only substantial issue raised by the complaint is contained in Count One. Count One alleges in substance that HUD, BRA, and the Developer are engaged in a project known as "TDC Phase Two" (hereinafter referred to as "the Project") to rehabilitate 36 buildings at various addresses within the South End Renewal Plan area so as to produce 185 dwelling units, and that in connection therewith HUD has not filed an Environmental Impact Statement as required by the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C). The act requires such a statement as a prerequisite to any major federal action significantly affecting the human environment. The plaintiffs seek to enjoin the Project until such a statement is filed.

### Major Federal Action

■ All the parties agree that the mortgage insurance undertaken by HUD and the guarantee of interest payments to be made by the Developer by HUD constitute "major federal action." The defendants and the intervenors contend, however, that the participation by HUD, a federal agency, has been fixed by contracts executed on January 31, 1974, the day on which the complaint was filed, and that there is no discretionary action left for HUD which could be influenced in any way by the existence of an Environmental Impact Statement. This issue must be resolved in accordance with Jones v. Lynn, 477 F.2d 885 (1st Cir., 1973).

I find the following facts:

On December 28, 1973 HUD entered into a Commitment for Insurance of Advances with the Developer and its construction loan mortgagee, First Federal Savings and Loan Association of Wor-

cester. HUD committed itself to insure the repayment of construction loans advanced to the Developer for purposes of the Project in an aggregate amount of $3,859,500. The commitment further provided that separate certificates of insurance should be executed by the Federal Housing Commissioner as agent for HUD with respect to each advance made to the Developer under the construction loan agreement.

Thereafter, on January 31, 1974, BRA conveyed to the Developer the parcels of land and the buildings which are to be rehabilitated under the Project. The Developer entered into a construction loan agreement with the First Federal Savings and Loan Association of Worcester in an aggregate amount of $3,859,500. Under the construction loan agreement, $330,598.08 was immediately advanced to the Developer. On the same day, a certificate of mortgage insurance in the amount of $330,598.08 was issued by the Federal Housing Administration in accordance with HUD's commitment dated December 28, 1973. HUD Handbook 4460.1 at pages 2–35 and 3–12 provides that there shall be no change in the design, plans, specifications, or other contract documents with respect to a project after HUD has made a firm commitment. I find and rule that the execution of the certificate of mortgage insurance on January 31, 1974 caused the Commitment for Insurance dated December 28, 1973 to become irrevocable and hence a firm commitment of HUD.

Notwithstanding the firmness of its commitment, however, HUD reviews each application for a new mortgage insurance certificate covering each advance under the construction loan agreement. The purpose of this review is to determine that all construction is in accordance with all of the applicable rules, regulations, and specifications. The Assistant Director for Technical Service of HUD testified further that even though all of the rules, regulations, and specifications had been complied with, he would hold up mortgage insurance as to the completion of any structure if envi-

ronmental factors came to his attention in connection with a particular structure which might jeopardize the safety and health of the eventual tenants of the rehabilitated structure. HUD would not be authorized to require any changes in the design of the project, but it could withhold insurance and thus hold up the payment of any mortgage loan advances until the potentially hazardous factors were removed by appropriate redesign.

■ On the one hand, then, "commitments have been made to non-federal participants, as to whom, in the total mix, it would be inequitable to back out." On the other hand, HUD retains significant discretionary powers to indirectly effect an alteration of plans in the extreme situation where it is likely that the safety and health of prospective tenants might be endangered by environmental circumstances. Jones v. Lynn, *supra*, p. 890. In such a situation the district court is directed to exercise "imagination and flexibility," *id.*, p. 892.

### Significantly Affecting the Quality of The Human Environment

■ In order to carry out that direction it is first necessary to decide if the federal action significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C).

I find that the Project is entirely concerned with the rehabilitation of existing residential dwellings within the South End Renewal Plan area. Virtually all of the rehabilitation work will be done to the inside of the buildings to provide apartments for low- and middle-income families. The only exterior work will be of a cosmetic nature to restore the facades of the buildings to their original appearance. No new building will be constructed, and no old building will be torn down. No trees will be cut, and no open spaces will be filled. There will be no change in existing street layouts or traffic patterns. The buildings were used for residential purposes before they were taken by BRA and will be used for residential purposes after the renovation is complete. The popula-

tion density within the Project area will be slightly less as a result of the Project than it was before the takings were made because some of the buildings which were formerly rooming-houses will be converted to apartment houses.

While the environmental situation in the South End may be far from ideal, there was no evidence presented in the course of the hearings which would tend to show that the Project "will cause adverse environmental effects in excess of those created by existing uses in the area affected by it." Hanly v. Kleindienst, 471 F.2d 823, 830 (2nd Cir., 1972). There was no evidence which would tend to show any significant effect on the environment which would result from the completion of the Project. Hiram Clarke Civil Club, Inc. v. Lynn, 476 F.2d 421, 427 (5th Cir., 1973).[1]

If it were simply a matter of applying the statutory standard to this Project, there would be no basis for granting the relief which the plaintiffs seek.

In addition to the statute itself, however, there exists a large body of administrative guidelines and regulations which, to some extent, impose more stringent requirements than the statute itself. Under its own regulations, HUD is prohibited without first filing an Environmental Impact Statement from insuring the financing of residential construction in areas where the existing environment does not meet certain minimum standards. HUD Circular 1390.1. HUD is, of course, bound by its own regulations and must act in accordance with them.

Each agency is obliged to establish standards and criteria for determining which of its activities are to be considered major federal actions significantly affecting the quality of the human environment. 40 C.F.R. §§ 1500.4 through 1500.6. Under guidelines established by the Council on Environmental Quality and The Environmental Protection Agency, "when an environmental review

indicates no significant impact a negative declaration shall be prepared prior to taking action." 40 C.F.R. § 6.25(A). Under HUD Circular 1390.1, as appearing in the Federal Register, Vol. 38, No. 137, the form of negative statement required for a rehabilitation project involving 100 or more units is referred to as "a Special Environmental Clearance." In accordance with the requirements of Circular 1390.1, a Special Environmental Clearance was prepared with respect to the Project.

The Special Environmental Clearance describes in some detail the physical environment with respect to air quality, water quality, noise levels, land use, physical character of the area, and the availability of various utilities. The Special Environmental Clearance statement also describes in considerable detail the social environment, including the community facilities such as schools, recreation facilities, libraries, transportation, fire stations, and the like, and "the socio-economic and racial characteristics of the community." Testimony in the course of the hearing disclosed that many of the conclusions reached in the statement were derived from secondary sources such as the official reports of departments of The City of Boston and Federal Census reports. With respect to all of the above matters, the statement concludes that the Project will have no significant adverse effect on the quality of the human environment in the Project area, and that the existing environment meets minimum standards. I find the conclusions reached by HUD in its Special Environmental Clearance to be reasonable and arrived at by reasonable methods of research. Save Our Ten Acres v. Kreger, 472 F.2d 463 (5th Cir., 1973).

The plaintiffs have directed special attention to the possibility of the existence of unacceptable noise levels at sites on Massachusetts Avenue resulting from the traffic flow on Massachusetts Avenue.

---

[1]. It is my opinion that *Hanly* states the correct standard rather than *Hiram Clarke*, but in this case the choice of standard would not alter the result.

It is conceded that these noise levels are existing noise levels and not created or exacerbated by the Project.

The nature of the noise pollution study, however, requires more detailed discussion. Sometime prior to January 26, 1973, the Developer conducted a noise assessment study, the results of which were reported to HUD. This study was conducted in accordance with a HUD Handbook entitled "Noise Assessment Guidelines." The procedure calls for the use of a standard graph form, the vertical coordinate of which reflects the average number of trucks per hour at peak period, and the horizontal coordinate of which reflects the distance of the site from the center of the roadway. The resultant of these coordinates will fall within areas designated on the graph as "clearly acceptable," "normally acceptable," "normally unacceptable," and "clearly unacceptable." The results of this study showed that several of the sites on Massachusetts Avenue were in the "clearly unacceptable" zone.

In accordance with the standard HUD practice, this adverse report required an actual measurement of the noise levels at these sites. At the Developer's request, HUD permitted sound level meter readings to be conducted by the Developer itself in order to save expense. This was done sometime prior to May 1, 1973, and the report of this study is contained in a letter from the Developer to HUD dated May 1, 1973.

As a result of the test, the Developer reported that the interior noise level at the Massachusetts Avenue sites were acceptable within the definition of HUD's Circular 1390.2 and that the external noise level was "normally acceptable" within the meaning of that circular. There was testimony, and I find, that HUD was not satisfied with this report and ordered a further testing of the noise levels to be conducted by the Arnold Green Testing Laboratory, an independent firm of experts. Their report, dated August 29, 1973, is incorporated in the Special Environmental Clearance.

The Laboratory's tests showed that interior noise levels at all of the Project sites on Massachusetts Avenue complied with the requirements of HUD Circular 1390.2 except for the top floors at 423 Massachusetts Avenue and 425 Massachusetts Avenue. It was the opinion of the tester that the Developer's plan to doubleglaze the windows and install air-conditioning at those two locations would satisfactorily attenuate the noise problem.

Thereafter the Developer changed its plans and instead of installing double-glazed windows and air-conditioning in the sleeping quarters at those two sites, redesigned the units so that the sleeping quarters were in the rear of the building. A letter from the Arnold Green Testing Laboratory dated November 13, 1973, which is a part of the Special Environmental Clearance, expresses the Testing Laboratory's opinion that as so redesigned, the sleeping quarters will comply with the noise level standards contained in HUD Circular 1390.2.

Even though an Environmental Impact Statement was not required in the above situation under the provisions of Appendix A2 to HUD Circular 1390.1 and HUD Circular 1390.2, there was testimony, which I find to be true, that the procedures followed in determining the acceptability of the noise levels at the questioned sites were exactly the same as would have been followed in the preparation of an Environmental Impact Statement. I find that if an Environmental Impact Statement were now required, the investigation as to the noise level at the Project sites on Massachusetts Avenue would be a repetition and duplication of the investigation conducted in the preparation of the Special Environmental Clearance.

On November 15, 1973 HUD's environmental clearance officer certified that the Project had no significant environmental impact, i. e., that it would not "significantly affect the quality of the human environment." I find and rule that this ultimate conclusion was reasonable and based on subsidiary findings

which were reasonable and reasonably arrived at, and in accordance with HUD regulations.

Congress and the Executive have made emphatic policy statements favoring strict enforcement of The National Environmental Policy Act. Silva v. Romney, 473 F.2d 287, 292 (1st Cir., 1973). Even taking that policy into consideration, however, the plaintiffs have not presented a basis for the granting of equitable relief on Count One of the complaint.

### Count Two

In Count Two of the complaint the plaintiffs allege that the South End Renewal Plan, of which the Project is a part, was materially changed after its approval by the Boston City Council. They urge enjoinment of the Project on that ground.

I find that the original plan called for the demolition of existing residential structures on Parcel PB4 at the corners of Columbus and Massachusetts Avenues and the construction thereon of a new elementary school. New housing units were to be constructed on Parcel 16, which is bounded by Columbus Avenue, Davenport Street, Tremont Street, and Camden Street. On April 26, 1973 the BRA issued a proclaimer certificate evidencing the following change in the plan: The existing residential buildings on Parcel PB4 are to be retained in part for rehabilitation, and the new elementary school is to be constructed on Parcel 16. Some of the sites which are to be rehabilitated as part of the Project are on Parcel PB4. The proclaimer certificate was filed with the Boston City Council for a 14-day period prior to the effective date of the change.

I find that the change was made in compliance with the requirements of HUD Urban Renewal Handbook RHM7207.1. The plaintiffs have not cited to the Court any statute or regulation which requires a change of the sort undertaken by the defendants in April 1973 to be acted upon by the Boston City Council or any other local authority. They have not offered any evidence to show that the Project does not comply with the Plan. The plaintiffs have presented no ground for equitable relief under Count Two.

### Order

Accordingly, the applications for a preliminary injunction and a permanent injunction are denied.

The complaint is dismissed with costs to the defendants.