Jose Luis **RODRIGUEZ** and Elba Montalvo, Plaintiffs,

v.

Henrietta B. **PERCELL,** Individually and in her official capacity as Executive Assistant to the Chancellor of the New York City School District, et al., Defendants.

No. 74 Civ. 1430.

United States District Court, S. D. New York.

March 14, 1975.

**39**

Puerto Rican Legal Defense & Education Fund, Inc., New York City, for plaintiffs; M. D. Taracido, Herbert Teitelbaum, Richard J. Hiller, Kenneth Kimerling, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for defendants; James J. Greilsheimer, Doron Gopstein, Michael S. Cecere, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

This case arises from an abuse of official power incident to the litigation concerning bilingual education entitled Aspira of New York, Inc. v. Board of Education of City of New York, D.C., 72 Civ. 4002. The latter controversy, though not altogether concluded, was brought to the point of a seemingly constructive consent decree on August 29, 1974. In this case, having ended (under a court order) a blatant violation of first amendment rights, defendants resist either a meaningful assurance from themselves or a declaration from the court to bar similar transgressions.

When plaintiffs in the *Aspira* case moved for summary judgment, they confronted apparent issues as to the character of bilingual instruction then being offered and its adequacy to serve Hispanic students who spoke little or no English. They sought affidavits on these subjects from principals, teachers, and others in the City school system involved or familiar with existing programs of the kind in question. The plaintiffs herein, and evidently others, were ready and willing to give their knowledge in this fashion.

On March 28, 1974, however, there issued from the office of the defendant Chancellor a so-called "relay" for which

"chilling" may be too balmy a word. Transmitted to all the schools, this communication said:

"TO: All Community School Board Members and all Superintendents

"FROM: Henrietta Percell, Executive Assistant to the Chancellor

"RE: Relay for Transmission to all Schools

— — — — — — — — —

"No teacher or principal is to give any affidavits, statements, other opinions or materials in answer to any request made by the counsel to the plaintiffs in the Aspira case. To give such information on the Chancellor to the plaintiffs is a violation of Section 1106 of the New York City Charter and may, if the information is given knowingly constitute a misdemeanor. If any person is requested to give such information, that person should contact the Corporation Counsel assigned to this case, Michael Cecere, at 566–6377."

The charter provision cited in, and claimed to support, that warning reads in pertinent part:

"(1) No * * * officer, employee or person whose salary is payable in whole or in part from the city treasury

\* \* \* \* \* \*

"e. shall * * * give opinion evidence against the interests of the city in any litigation to which the city, or an agency is a party * * *."

Violation of this provision is, as the relay sternly reminded, punishable as a misdemeanor.

Plaintiffs promptly brought the instant case seeking to enjoin the continuation or execution of the threats in the relay and asking a declaration that Charter § 1106(1)(e) is unconstitutional on its face and as applied. With the in-stitution of the action, plaintiffs moved for a preliminary injunction. When both sides appeared in court on March 28, 1974, to deal with the initial order to show cause, counsel for the defendants argued in support of the power to impose the rule of silence proclaimed in the relay. The court observed that the Federal Constitution might require a different conclusion. Between the date when the temporary restraint issued and the return date, April 2, 1974, defendants neither rescinded the relay nor acted otherwise to affirm the pertinent rights of the thousands of City teachers and principals under the first amendment. On the return day, however, counsel for defendants announced that they had "reconsidered" and concluded that § 1106 of the Charter should not be deemed after all to authorize the gag proclaimed by their relay. Upon this statement, the court on the following day issued its conclusions of law and preliminary injunction, declaring that defendants had offended against the first and fourteenth amendments, nullifying the relay and its threats, and requiring a notice conveying these results to school personnel.

Now both sides, having failed in attempts to end the case some other way, have moved for summary judgment. Plaintiffs, in addition to seeking a final decree, ask for an affirmation that this is properly a class action. Defendants question the utility of class-action treatment and, more importantly, ask that the action be dismissed as moot or at best unnecessary.

I.

The prayer for class-action treatment is essentially unopposed. It is plain that the case is one appropriate for such treatment under F.R.Civ.P. 23(b)(2). Accordingly, the suit is and has been properly maintainable for plaintiff class,[1] and the relief hereinaft-

1. The class consists of all those employed by the Board of Education whose salaries are paid wholly or in part by New York City and who "wish to but are prohibited by defendants from submitting affidavits, state-ments, materials and/or other information, not confidential in nature, in connection with litigation to which New York City or one of its agencies is a party."

er ordered will inure to the benefit of that class.[2]

## II.

There are neither material issues of fact nor any issues of law affecting the ultimate subject of first and fourteenth amendment rights. Defendants now concede that their use of § 1106(1)(e) in the relay was unconstitutional, though the concession has been long in coming.[3] They argue only that the concession, extracted after a preliminary injunction, moots the case, and they go on to assert that there is not even a justiciable controversy any more.

The claims of mootness and nonjusticiability start with defendants' tendency to recall that they hardly ever meant, for more than a fleeting instant, to impair plaintiffs' rights. The Chancellor, having been led to forget the robust stance of his attorney and his executive assistant before the court expressed some views, makes an affidavit that is inaccurate because it leaves out vital events. He recalls the injunction of April 3, 1974, and the compliance therewith. Ignoring what had gone before, he informs us simply that "defendants had previously decided to rescind" the relay. Building upon this, defendants' brief states, erroneously, that "defendants in this action voluntarily ceased the conduct sought to be enjoined, prior to the issuance * * * of a preliminary injunction."

The fact is that defendants, construing and applying § 1106, used it to attempt a gross invasion of first amendment rights, to say nothing of rights to gather and present relevant and competent evidence to this court. Read literally, the sweeping language of § 1106 could embrace the prohibition announced in the relay. And defendants did read it

that way. Only the first amendment compels a different reading. And it required this lawsuit to bring that to defendants' attention. Not only had the Chancellor and his staff ignored the patent conflict between their ukase and the first amendment. In addition, acting as if official power were a kind of proprietorship, they found it suitable to think that educators expressing views they opposed for teaching children should be deemed to be acting "against the interests of the city * * *."

■ At all events, § 1106, as read and employed by officials empowered to use it, has been demonstrated to embrace sweeping and drastic repressions forbidden by the first and fourteenth amendments. This is not a case where unconstitutional overbreadth is to be gleaned merely from textual analysis. Rather, the vice has been demonstrated concretely in action; the charter provision is revealed to be unconstitutional as applied, not merely on its face as a matter of textual analysis. Given the events that caused this lawsuit, and recalling that it took a preliminary injunction to erase the effects of the defendants' repressive threats, the claim of mootness would fail even if there were not additional facts, hereinafter recounted, to defeat it. See Gray v. Sanders, 372 U.S. 368, 376, 83 S.Ct. 801, 9 L.Ed. 2d 821 (1963); United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Aurora Education Ass'n v. Board of Education, 490 F.2d 431, 435 (7th Cir. 1973), cert. denied, 416 U.S. 985, 94 S.Ct. 2388, 40 L. Ed.2d 762 (1974); Gatling v. Butler, 52 F.R.D. 389, 393–95 (D.Conn.1971).

Even so, the court would have preferred if possible to avoid the denunciation entailed in a final decree declaring the charter provision unconstitutional.

---

2. Defendants point out that the City may be relied upon to obey any final decree in this case, suggesting that it is therefore unnecessary to hold the action to be on behalf of a class. The same may be said, however, in the great bulk of cases for which subdivision (b)(2) of Rule 23 was written. The least that can be said on the other side is that the rule plainly applies, that there is no discernible prejudice to defendants in applying it, and that plaintiffs are entitled to have the full scope of their decree made explicit and unmistakable.

3. The concession was made, after some prodding, at oral argument on March 5, 1975.

In the service of that preference, the Corporation Counsel was invited during the months since the preliminary injunction to announce or obtain an authoritative construction of § 1106 that might narrow it to constitutionally tolerable limits. That course has not been pursued. Nevertheless, defendants say, there is no need for further action because they continue to acknowledge the rights of plaintiffs to give affidavits in the *Aspira* case. But that in turn is a crabbed misconception of what is at stake. It is not enough that defendants promise they will send no more relays exactly like the one the court has already outlawed. The charter provision remains a literal license for other attempts at sweeping prohibition, possibly different in detail but still colliding with federal constitutional rights. The vices of vagueness and overbreadth are not cured at all by an assurance that a single species of invasion will be avoided.

In any event, recent happenings destroy utterly the claim of mootness. From what the parties reported, it seemed until the other day that the relay giving rise to the present action was the first occasion in its history of nearly 40 years on which the opinion evidence provision of § 1106 was invoked. In other words, there was only one reported abuse, though this single application of the statute was patently—and, finally, concededly—unconstitutional. Still more recently, however, another, seemingly grimmer chapter has been added. Within the past month, the Corporation Counsel and the District Attorney for Kings County have joined forces in the Supreme Court, New York County, to enjoin for obscenity the showing of a motion picture. Richland, et al. v. Benson Theatre Corp., et al., No. 42228/74. At the trial a professor of sociology who teaches at the City College of New York was called to the witness stand by defendants. An assistant corporation counsel—a colleague of those who are here arguing mootness—advised the court and the professor of what he perceived as a collision with § 1106. The professor decided not to testify. Defendants called another expert, a psychiatrist, who, as defendants say it, "does some teaching at the Albert Einstein School of Medicine," which, an assistant corporation counsel opined, "receives some City funds * * *." § 1106 was wheeled out again, and the judge cautioned the doctor of his possible peril. The doctor went ahead and testified despite the warning.

■■ The fact that one of the two threatened witnesses dared to testify is interesting but not significant for us. The Constitution was not made only for heroes. The protection against chilling or freezing the exercise of first amendment rights extends to those in the normal range of prudence·or fearfulness as well as those who may be hardy or foolhardy. See Epperson v. Arkansas, 393 U.S. 97, 101–02, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); NAACP v. Button, 371 U.S. 415, 432–33, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). What matters here is the current and continued demonstration that § 1106 is capable of being used— and thus far is used exclusively—as a primitive blunderbuss against constitutionally protected expression.[4] It might have been hoped that the assistants to the Corporation Counsel would learn of his tardy surrender to the Constitution

---

4. There was a suggestion at oral argument that the asserted power to deter witnesses from giving expert opinion evidence like that in the obscenity case might turn on whether the witnesses were receiving fees. It is perfectly clear, however, that the invocation of § 1106, and the threat to employ its sanctions, had nothing to do with this belatedly tendered idea. The assistant corporation counsel who admonished or threatened the sociologist and the psychiatrist did so without inquiring (certainly before inquiring) whether either was being paid. The subject is, in any event, scarcely worth a footnote. The first amendment would protect the right of scholarly and professional expression in this setting whether or not the speaker received a fee. New York Times Co. v. Sullivan, 376 U.S. 254, 265–66, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

in this case and would see that their unleashing of § 1106 could only be more egregious in a case concerned precisely with first amendment issues. But whatever we might have hoped, there is a prayer for relief before us, and the dismal events of the obscenity case underscore the live character of the problem. See Epperson v. Arkansas, *supra*, 393 U.S. at 101–02, 89 S.Ct. 266.

▉ The court holds, then, that § 1106(1)(e) of the New York City Charter, insofar as it purports to forbid the giving of opinion evidence, is unconstitutional both on its face and as it has been applied in this case. It appears that a declaratory judgment to this effect will afford sufficient relief. The basis for this thought is, of course, that the court should respect and accept the City's assurances that a final judgment will evoke uniform compliance. If the assumption proves mistaken, a possibility to be doubted even while it is noted, the court will be astute to protect first amendment rights by less agreeable forms of decree.

Settle a declaratory judgment on notice.