Guilliaem AERTSEN et al., Plaintiffs,

v.

Moon LANDRIEU, Secretary of U.S. Department of Housing and Urban Development et al., Defendants.

Civ. A. No. 78–3271–C.

United States District Court,
D. Massachusetts.

March 31, 1980.

determined by the judge. *Azzarello v. Black Brothers Co.,* 480 Pa. 547, 556–58, 391 A.2d 1020, 1025 (1978).

Thomas B. Bracken, Bracken, Selig & Baram, Boston, Mass., for plaintiffs.

Carolyn S. Grace, Asst. U. S. Atty., Boston, Mass., Harold J. Carroll, Gen. Counsel, Boston Redevelopment Authority, Margaret M. Brown, Boston, Mass., for Robert J. Ryan.

## MEMORANDUM

CAFFREY, Chief Judge.

On March 27 1979, this Court entered a preliminary injunction to enjoin demolition of certain existing structures on the proposed site of Viviendas La Victoria II (La Victoria II), a federally-subsidized housing project in the South End Urban Renewal Area of Boston. *Aertsen v. Harris*, 467 F.Supp. 117 (D.C.1979). This injunction was to remain in effect pending completion by HUD of a revised Special Environmental Clearance (SEC) considering the impact of the proposed demolition on the environment. That process has been completed, and the defendants have submitted a Supplement to the Special Environmental Clearance. The defendants now move this Court to vacate the injunction and dismiss the action. The plaintiffs oppose the motion to vacate on several grounds.

## I

The plaintiffs first contend that the defendants have not adequately complied with Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, as amended. Section 106 requires federal agencies with authority over proposed federally assisted undertakings to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]." The agencies are also required by Section 106 to "afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking."

At the time this Court entered the injunction preventing the proposed demolition, the defendants had not yet complied with the requirements of Section 106. 467 F.Supp. at 121. Of the fifteen buildings scheduled to be demolished, eight are located within the South End Historic District. The Historic District was listed in the National Register of Historic Places on May 8, 1973. The other seven buildings are situated outside of but close to the Historic District. Since the issuing of the injunction, the defendants have decided to rehabilitate, and not demolish, the eight buildings located within the Historic District. Therefore, the controversy now centers on whether the defendants have properly complied with the requirements of Section 106 with regard to the demolition of the other seven buildings.[1] Plaintiffs make several contentions regarding the adequacy of the Section 106 review, and I will treat these seriatim.

A. I first deal with plaintiffs' contention that the seven buildings adjacent to the Historic District are themselves eligible for inclusion in the National Register. The criteria for eligibility are set forth in 36 C.F.R. § 60.6. The criteria, in relevant part, cover structures that "possess integrity of location, design, setting, materials, workmanship, feeling, and association, and . . . [t]hat embody the distinctive characteristics of a type, period, or method of construction . . . ." Plaintiffs have submitted affidavits to support their contention that the seven buildings located out-

---

1. Three other buildings outside the Historic District and one playground shelter within the Historic District are also scheduled for demolition; plaintiffs do not contend that these buildings are eligible for inclusion within the District, and I will not consider them further.

side the Historic District satisfy the criteria for inclusion within the District.[2]

The regulations promulgated pursuant to Section 106 require federal agencies with jurisdiction over a federally assisted undertaking to identify "any National Register or eligible property that is located within the area of the undertaking's potential environmental impact and that may be affected by the undertaking." 36 C.F.R. § 800.4(a). Although the ultimate responsibility for identifying eligible property rests with the federal agency, the agency official is to exercise his authority in consultation with the State Historic Preservation Officer. § 800.4(a)(1)–(3). If, after applying the National Register criteria to all properties that may possess historic or cultural value, either the agency official or the State Historic Preservation Officer finds that a property meets the National Register criteria or that it is questionable whether a property meets the criteria, the agency official must seek a determination of eligibility from the Secretary of the Interior pursuant to 36 C.F.R. Part 63. If, on the other hand, the agency official and the State Historic Preservation Officer agree that no identified

property satisfies the criteria, the agency official shall document this determination and may proceed with the undertaking. § 800(a)(3). This determination of eligibility is to take place prior to affording the Advisory Council on Historic Preservation an opportunity to comment on the undertaking as required by Section 106. § 800(a)(4).

The defendants have submitted correspondence taking place in May 1979 between the Area Manager of HUD and the Massachusetts Historic Preservation Officer wherein the two officials concurred that the seven buildings to be demolished do not meet the eligibility criteria for listing in the National Register. The Massachusetts Historic Preservation Officer noted that, "[w]hen the South End was surveyed for possible designation as a National Register Historic District, these properties were excluded from the area nominated for review. It was felt, and is still held, that these properties have or retain little or no architectural significance or integrity, and appear to have no historical associations which would meet National Register Criteria." [3]

2. The contents of these affidavits is summarized in plaintiffs' brief as follows:
"As shown by the Larson and Cassie affidavits submitted herewith, the late Victorian yellow brick houses at 11–14 Pembroke Street, the old 1850's wooden house and the three brick buildings surrounding it on Newland Street meet the eligibility requirement for inclusion in the National Register. They each "embody the distinctive characteristics of a type, period, or method of construction" and also are significant as components of significant groups of historic structures. Specifically, the three Victorian townhouses at 11–14 Pembroke Street are representative of a type, design and method for construction of buildings common in the South End in the late 19th century. The dominant features of these buildings are the use of yellow bricks, round arched recessed entryways and two story pilastered oriel windows. (Carson aff't. para. 3; Cassie aff't. para. 5). Only a few buildings of this type remain in the South End, one of which in the Historic District recently was rehabilitated by the BRA. (Cassie aff't. para. 5). These yellow brick Victorian townhouses are significant individually and, in combination with their red brick bow-fronted neighbors across the street in the Historic District, represent a unique example

of a streetscape containing two important architectural periods in the South End during the 19th century.
The wooden house on Newland Street is a rare survivor of an architectural type common in the South End before the red brick bow-fronted Victorian houses became popular in the 1850's and 1860's. (Cassie aff't. para. 7; Larson aff't. para. 2). The later 19th century red brick buildings on Newland Street which surround the 1840's wooden house also are distinctive and, together with the wooden house, provide a rich example of a variety of architectural types from different historical periods in the South End. (Larson aff't. para. 2)."

3. A summary of the factors taken into account in deciding that the buildings outside the Historic District are ineligible for inclusion is contained in the Supplement to the SEC:
"A typical South End row house is set back 8–10 feet from the sidewalk, with a wide brownstone stairway with ornamental rails on each side leading to a double door entrance. The front setback and grade difference in elevation as well as the grade of the rear yard which varies from 6 to 8 feet from the ground floor is another prominent feature

The above correspondence convinces me that HUD's determination of ineligibility was made in accordance with the procedures set forth in § 800.4(a). Therefore, its determination may not be overturned unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Cobble Hill Ass'n v. Adams*, 470 F.Supp. 1077, 1083 (E.D.N.Y.1979). After reviewing the correspondence, the information contained in the Supplement to the SEC, the plaintiff's affidavits, and the photographs and other exhibits introduced at the earlier hearing, I rule that the determination of ineligibility was not arbitrary or capricious and has ample support in the record.

■ B. I turn next to plaintiffs' contention that the project will have an adverse effect on the properties included within the Historic District and that HUD's determination that the project will have no adverse effect was erroneous. The regulations promulgated under Section 106 require the federal agency official, once he has identified properties within the area of the project's impact which are included in or eligible for inclusion in the National Register, to make a determination, in consultation with the State Historic Preservation Officer, as to what effect the project will have on the characteristics which qualify these properties for inclusion. 36 C.F.R. § 800.4(b). The agency official may determine that the project will have no effect, in which case the project may proceed, § 800.4(b)(1); or,

the agency official may determine that the project will have an effect, but that the effect will not be adverse, in which case he must forward "adequate documentation" of the determination of no adverse effect, including the concurrence of the state official, to the Advisory Council for review and comment, § 800.4(c); finally, the agency official may determine that the project will have an adverse effect, § 800.4(d), in which case he must proceed with the in-depth consultation process set forth in § 800.6(b).

On July 13, 1979, the area manager of HUD sent a letter to the Advisory Council, with the concurrence of the Massachusetts Historic Preservation Officer attached, containing HUD's determination that the La Victoria II project would have "no adverse effect." The regulations prescribe the criteria upon which such a finding may be based:

"(b) *Criteria of Adverse Effect.* Adverse effects on National Register or eligible properties may occur under conditions which include but are not limited to:

(1) Destruction or alteration of all or part of a property;

(2) Isolation from or alteration of the property's surrounding environment;

(3) Introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting;

(4) Neglect of a property resulting in its deterioration or destruction.

of the South End Historic District. The South End was built of predominant single family row houses with bow fronts of 3, 4, 5 stories high.
The South End Historic District row houses are walls of continuity, with rhythm of entrances and proportion of front facades. They have a relationship of materials and expression of front elevation. None of these buildings outside of the Historic District has this sense of continuity. The Nomination Form for the South End Historic District (MHC, Feb. 1973, page 2) states:
    The South End is a large but well defined, densely built-up area which is characterized by architecture of a relatively few building types. It presents a unified environment distinguished by subtle variations in architectural style, defining building height and street

width and direction and by the presence or absence of park areas.
The boundaries of the South End Historic District deliberately excluded sections of the South End Urban Renewal Area which contained structures that did not conform in design, scale, or character of the traditional South End row house or were non-residential. The South End Historic District was planned and developed between 1848 and 1870. It is an enclave of Victorian residential structures. The buildings outside the district were built after the completion of the Victorian neighborhood. They are located (as stated in an earlier paragraph) in a pocket of the South End which detracts from the district's sense of time, place and historic development. They are not of historic significance to the South End Historic District."

(5) Transfer or sale of a property without adequate conditions or restrictions regarding preservation, maintenance, or use." § 800.3(b).

The regulations also provide that the documentation for a finding of no adverse effect, which must be forwarded to the Advisory Council, should include the following information:

"(1) A description of the agency's involvement with the proposed undertaking with citations of the agency's program authority and applicable implementing regulations, procedures, and guidelines;

(2) A description of the proposed undertaking including, as appropriate, photographs, maps, drawings, and specifications;

(3) A list of National Register and eligible properties that will be affected by the undertaking, including a description of the property's physical appearance and significance;

(4) A brief statement explaining why each of the Criteria of Adverse Effect (See § 800.3) was found inapplicable;

(5) Written views of the State Historic Preservation Officer concerning the Determination of No Adverse Effect, if available; and,

(6) An estimate of the cost of the undertaking, identifying Federal and non-Federal shares." § 800.13(a).

The letter sent by HUD to the Advisory Council informed the Council that HUD's involvement in the project was to provide Section 8 assistance and mortgage insurance for 198 units of family housing, described the location of the project as including land both within and adjacent to the Historic District, advised the Council that a playground shelter constructed in 1962 and located within the Historic District would be demolished, notified the Council that the other eight buildings within the District which were previously scheduled to be demolished would be rehabilitated instead, included plans and drawings for the new construction and a list of materials to be used in both the new construction and the rehabilitation, contained a photograph of the existing buildings and the project area, and stated that meetings had been held and measures taken to make the project "compatible with the existing environs." The letter concluded with HUD's finding of no adverse effect. On August 14, 1979, the Advisory Council responded with a concurrence in HUD's finding of no adverse effect. This concurrence was, however, conditional upon the submission of final design plans for rehabilitation of the eight buildings within the Historic District to the State Historic Preservation Officer for review and approval.

Plaintiffs challenge HUD's determination of no adverse effect both as to the demolition of the buildings outside the District and as to the construction of the new townhouses. Since I do not find HUD's determination of no adverse effect arbitrary or capricious with respect to either the demolition or the new construction, I rule that this contention is without merit.

■ C. Plaintiffs also challenge the adequacy of the concurrence by the Advisory Council, contending that the Council did not have an opportunity to concur in HUD's determination that the demolition of buildings adjacent to the Historic District would have no adverse effect. The basis for this contention is that HUD's letter of July 13 did not specifically advise the Council of its intention to demolish various buildings adjoining the Historic District. Therefore, plaintiff argues, the letter of August 14 from "the Advisory Council to HUD cannot be construed as a concurrence with HUD's finding that demolition . . . would have no adverse effect on properties in the District or eligible for inclusion, because HUD had not informed the Council that the project involved any such demolition." (Plaintiffs brief at 8).

Although plaintiffs are correct that HUD's letter did not specifically mention the demolition of buildings outside the Historic District, it does not necessarily follow that the documentation submitted by HUD did not advise the Council of the proposed demolition. The photograph of the existing buildings and area, along with the project

plans which were submitted, should have fairly apprised the Council of the demolition. In any event, plaintiffs' counsel, in letters dated March 29 and July 5, 1979, himself advised the Council of the proposed demolition of the proposed demolition of the buildings located adjacent to the Historic District. The Council responded to plaintiffs' letters in a letter dated August 14, 1979, the same day that the Council notified HUD of its conditional concurrence; the letter informed plaintiffs of the Council's concurrence in HUD's determination of no adverse effect. This correspondence is further evidence that the Advisory Council was aware of and did consider the proposed demolition of buildings adjacent to the Historic District before concurring in HUD's determination. I would add that, even if the Council was not aware of and did not consider the effect of the proposed demolition, not every deviation from proper procedures justified the issuance of injunctive relief. *See D. C. Federation of Civic Associations v. Adams*, 571 F.2d 1310, 1313–14 (4th Cir. 1978). I therefore rule that the failure of HUD to bring to the Advisory Council's attention the demolition of buildings adjacent to the Historic District, which had already been properly determined not eligible for inclusion in the District, was not so material as to require invalidation of an otherwise proper Section 106 review.

D. Plaintiffs next contend that the letter sent by HUD to the Advisory Council on July 13 did not satisfy the requirements of § 800.13(a), *supra*. I disagree, and rule that the letter and attached documentation substantially complied with § 800.13(a), and that any noncompliance was not so material as to require additional Section 106 review. I also note that the Advisory Council must have considered the documentation adequate, since it was obliged under the regulations to contact the agency within fifteen days if the determination of "no adverse effect" was not adequately documented. § 800.6(a)(1).

■ E. Finally, plaintiffs challenge HUD's Section 106 review on the ground that HUD denied plaintiffs their procedural right to participate in the review process. Plaintiffs rely primarily on § 800.15 of the regulations, which provides in part:

"The Council encourages maximum public participation in the review process under these regulations. The Council, Federal agencies, and State Historic Preservation Officers should seek assistance from the public including other Federal agencies, units of local and State government, public and private organizations, individuals and federally recognized Indian tribes in evaluating National Register and eligible properties, determining effect, and developing alternatives to avoid or mitigate an adverse effect. The public has considerable information available that could assist Federal agencies, the State Historic Preservation Officer and the Council in meeting their responsibilities under these regulations. The Council especially urges that Federal agencies make every effort to involve grantees, permittees, licensees, and other parties in interest in the consultation process."

Plaintiffs contend that § 800.15 constitutes a public participation requirement which HUD violated by not including the public in any way in its Section 106 review of the La Victoria II project.

Section 106 itself does not mention anything about public participation. And, while the regulation does demonstrate a preference for public participation in the determination of eligibility and effect, the language of the regulation is basically precatory rather than mandatory. The ultimate responsibility for making these determinations is still upon the federal agency official. Thus, although more extensive public participation might have been desirable and certainly a wiser course in the future, I decline to rule that the absence of such participation invalidates the Section 106 review in this case.

II

■ The plaintiffs next contend that the SEC and the Supplement thereto prepared by HUD for La Victoria II are inadequate, and that the injunction must remain in

effect until HUD completes a full Environmental Impact Statement (EIS). Plaintiffs first raised this issue in support of their motion for a preliminary injunction, asserting the necessity of an EIS on two grounds. First, plaintiffs challenged HUD's determination that La Victoria II is not a "major Federal action significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), NEPA's threshold for preparation of an EIS. Second, plaintiffs pointed out that completion of La Victoria II, the last of five phases in the Parcel 19 development plan, will raise the total number of housing units in Parcel 19 over 500, the point at which HUD's regulations require an EIS as opposed to an SEC. Therefore, plaintiffs argued, La Victoria qualifies as "major federal action" and HUD cannot avoid its responsibilities under NEPA by segmenting the project into several parts. In addition to these two arguments regarding the necessity for an EIS, plaintiffs challenged the adequacy of the SEC itself, contending that HUD had improperly failed to consider alternatives to La Victoria II, as required by 42 U.S.C. § 4332(2)(E).

Plaintiffs now renew their earlier arguments as to the requirement of an EIS and as to the adequacy of the SEC as supplemented. I rule that these arguments are foreclosed by my earlier ruling. Although that ruling did not expressly state that HUD's determination that an EIS was not required was a reasonable one,[4] the clear import of the discussion in that ruling was that an SEC, properly expanded to include the impact of demolition as well as construction, would satisfy HUD's obligations under NEPA, unless of course the supplemental study revealed that La Victoria II will have a substantial environmental impact. It was also implicit in my ruling that the only remaining alternative which HUD should more adequately consider was the

---

4. There has been a split in the Circuits as to the appropriate standard to employ in reviewing an agency's threshold decision that an EIS is not required for a particular project. *Compare Nucleus of Chicago Home Owners Ass'n v. Lynn*, 524 F.2d 225, 229-30 (7th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), *and Hanly v. Kleindienst*, 471 F.2d 823, 828-30 (2d Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (cases employed an "arbitrary and capricious" standard), *with Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1320 (8th Cir. 1974) (en banc), *and Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1248 49 (10th Cir. 1973), *and Save Our Ten Acres v. Kreger*, 472 F.2d 463, 466–67 (5th Cir. 1973) (cases employing a more stringent standard of "reasonableness"). *See also Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 1002 & n. 40 (D.C.Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980) (case seemingly employing both standards). Although the Court of Appeals for this Circuit has not yet spoken on which of the two standards of review is appropriate, the decided weight of authority in this and other Districts within the Circuit is that the more exacting "reasonableness" standard is proper when reviewing an agency decision or. to file an EIS. *Citizens for Responsible Area Growth v. Adams*, 477 F.Supp. 994, 999 (D.N.H.1979); *Essex County Preservation Ass'n v. Campbell*, 399 F.Supp. 208, 216 (D.Mass.1975); *Rhode Island Committee on Energy v. General Services Administration*, 397 F.Supp. 41, 57 (D.R.I.1975); *Mount Vernon Preservation Society v. Clements*, 415 F.Supp. 141, 146 (D.N.H. 1976); *but see Higgins v. U. S. Postal Service*, 449 F.Supp. 1001, 1004 (D.Mass.1978). *Cf. Silva v. Romney*, 473 F.2d 287, 292 (1st Cir. 1973).

Although the Supreme Court has never spoken on the appropriate standard of review, there is language in a recent decision, *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), which may foreclose use of the "reasonableness" standard:

"The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. . . . Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately." *Id.* at 412, 96 S.Ct. at 2731 (citations omitted).

*See also Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978); *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, —— U.S. ————, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). Absent, however a more explicit statement from the Supreme Court and in view of the weight of authority at the District level in this Circuit, I choose to apply the "reasonableness" standard in reviewing HUD's decision not to prepare an EIS in the case at hand.

rehabilitation, rather than demolition, of the buildings on the project site. In the supplement to the SEC, HUD has not altered its earlier determination that La Victoria II is not a major federal project with a substantial environmental impact; it has, however, reconsidered its earlier decision to demolish the eight buildings within the Historic District. I find that the SEC, as supplemented, is well documented and adequately considers the various environmental impacts which La Victoria II will have. I therefore conclude that HUD's determination not to prepare an EIS was reasonable and that the SEC itself is adequate.[5]

■ In so ruling, I do not intend to condone HUD's treatment of each part of the Parcel 19 development as an individual segment. As the Court of Appeals for this Circuit has already stated:

"one initial comprehensive study, which could be referred to and supplemented by less comprehensive individual studies for each parcel, would appear to reflect a better use of scarce resources. See, e. g., Sierra Club v. Froehlke, 359 F.Supp. 1289 (S.D.Tex.1973) . . .. [I]t would not seem sensible to adopt the piecemeal approach which HUD seeks to adopt, whereby it will prepare a modified impact statement separately for each proposed construction as a mortgage insurance application is filed, an approach akin to equating an appraisal of each tree to one of the forest. If HUD is expected to be part of the financing of most of the un-

planned and/or undeveloped parcels, it seems a perversion of NEPA for it to approach each parcel, wholly depending in its timing of environmental review on the filing of applications for assistance and considering anew the scene as it is changed by each subsequent approval. Not only would this be wasteful of bureaucratic resources, but the plurality of possible appeals would suggest a wasteful prolongation of time spent in litigation." Jones v. Lynn, 477 F.2d 885, 890–91 (1st Cir. 1973).

In the future, if HUD becomes involved in a development and there is a reasonable expectation of such further federal assistance to render the development a major federal project with a substantial environmental impact, HUD should prepare an EIS for the entire development.

■ In this case there is no indication that HUD segmented the Parcel 19 project with a "conscious design to circumvent the requirements of NEPA as would amount to bad faith." Ogunquit Village Corp. v. Davis, 553 F.2d 243, 246 (1st Cir. 1977). HUD was allowed by the Court of Appeals to segment an earlier phase of the Parcel 19 project, La Victoria I, because there was no reasonable expectation of further federal financing "as the subsidized housing program had been discontinued." Chick v. Hills, 528 F.2d 445, 448 (1st Cir. 1976). It was only after funds again became available in 1977 that the developer applied for

---

5. Plaintiffs have not presented any new evidence that La Victoria II "will cause adverse environmental effects in excess of those created by existing uses in the area affected by it." Wilson v. Lynn, 372 F.Supp. 934, 937 (D.Mass. 1974) (citing Hanly v. Kleindienst, 471 F.2d 823, 830 (2d Cir. 1972). In their brief in opposition to vacating the injunction, plaintiffs rely on a statement made by defendants in a draft EIS for the completed portions of the entire South End Urban Renewal Project, entitled "Financial Settlement South End Urban Renewal Project." In this document, dated March 1979, the defendants characterized La Victoria II as a "major housing development" proposed for construction in the South End. Plaintiffs treat this characterization as a concession by defendants that La Victoria II is a "major federal action" for purposes of 42 U.S.C. § 4332(2)(C).

I disagree. Plaintiffs have taken the characterization out of context and I do not read it as a concession by defendants that they are obliged to prepare an EIS as to La Victoria II.

Plaintiffs also seek to rely on a response by the Environmental Protection Agency (EPS) to the financial closeout draft EIS. The EPA questioned the exclusion of La Victoria II from the draft EIS, and requested that either La Victoria II be included in the final EIS, or that HUD "describe the mechanism by which assessments of the impacts will be done and made available for review and comment." HUD responded that it was in the process of supplementing its SEC and that this document would "be available for review and comment in accordance with HUD regulations." Contrary to plaintiffs, I find this an adequate response to the concerns expressed by EPA.

and received funding for La Victoria II. Since the basic function of an EIS is to serve as a forward-looking instrument to assist in evaluating "proposals" for major federal action, *Kleppe v. Sierra Club*, 427 U.S. 390, 406, 410 n. 20, 96 S.Ct. 2718, 2728, 2730 n. 20, 49 L.Ed.2d 576 (1976), I decline, absent a showing of bad faith, to require an EIS as an after-the-fact justification for a multi-phase development already substantially completed. Any incremental effects of the La Victoria II phase have already been adequately assessed in the SEC, as supplemented.

### III

■ Plaintiffs next contend that the injunction should remain in effect until the defendants comply with the requirements of the Massachusetts Environmental Protection Act (MEPA), Mass.Gen.Laws ch. 30, § 61 *et seq.* Defendants counter that they have complied with MEPA.

Under ch. 30, § 62A, and the regulations promulgated thereunder, 301 C.M.R. §§ 10:00 *et seq.*, an agency proposing a project must submit an Environmental Notification Form (ENF) to the Massachusetts Secretary of Environmental Affairs apprising him of the nature of the project. Within 30 days of publishing a notice that he has received an ENF, the secretary must make a determination whether an Environmental Impact Report, the MEPA equivalent of an EIS, is required for the project.

On December 13, 1979, the Boston Redevelopment Authority (BRA) filed an EIR regarding the La Victoria II project with the secretary. On January 25, 1980, after posting notice and receiving comments, including some from plaintiffs, the Secretary responded with a determination that an EIR would not be required for the project. The Secretary based that determination "upon two staff visits to the site and careful examination of all comments filed herein." The Secretary also considered and rejected plaintiffs' contention that the already constructed portions of the Parcel 19 Project be considered in conjunction with La Victoria II, thereby exceeding the 350

unit threshold for categorical inclusion contained in 301 C.M.R. § 10.32(5)(a)(17). The Secretary interpreted MEPA regulations to only require "likely future expansions," not pre-existing development phases, be taken into account in determining categorical inclusion. The pertinent regulation provides in part:

> "In determining exclusion or inclusion status, the entirety of a proposed project, including likely future expansions, shall be considered, and not separate phases or segments thereof." 301 C.M.R. § 10:32: Appendix C(i).

The plaintiffs challenge the Secretary's interpretation, focusing primarily on the language requiring consideration of the "*entirety* of a proposed project." I disagree with plaintiffs' interpretation, noting especially the presence of the word "proposed" in the very language cited by plaintiffs, and rule that the Secretary's interpretation is an entirely reasonable one. I also rule that his determination that no EIR is required is a complete answer to plaintiffs' contentions under MEPA.

### IV

Finally, plaintiffs challenge HUD's decision to fund La Victoria II under the Section 8 Rental Subsidy Housing Assistance Payments Program, 42 U.S.C. § 1437f, as authorized by the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq.*

Applications for Section 8 assistance must, *inter alia*, indicate:

> "the general locations or proposed housing for lower-income persons, with the objective of (i) furthering the revitalization of the community, including the restoration and rehabilitation of stable neighborhoods to the maximum extent possible, and the reclamation of the housing stock where feasible through the use of a broad range of techniques for housing restoration by local government, the private sector, or community organizations, including provision of a reasonable opportunity for tenants displaced as a result of such activities to relocate in

their immediate neighborhood, (ii) promoting greater choice of housing opportunities and avoiding undue concentrations of assisted persons in areas containing a high proportion of low-income persons, and (iii) assuring the availability of public facilities and services adequate to serve proposed housing projects;" 42 U.S.C. § 5304(a)(4)(C).

HUD's site selection standards are set forth in 24 C.F.R. § 880.112. These regulations provide, in relevant part:

"(c) The site shall not be located in: (1) An area of minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration, or (ii) the project is necessary to meet overriding housing needs which cannot otherwise feasibly be met in that housing market area. (An "overriding need" may not serve as the basis for determining that a site is acceptable if the only reason the need cannot otherwise feasibly be met is that discrimination on the basis of race, color, religion, creed, sex, or national origin renders sites outside areas of minority concentration unavailable.)

(2) A racially mixed area if the project will cause a significant increase in the proportion of minority to nonminority residents in the area.

(d) The site shall promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." 24 C.F.R. § 880.112(c) & (d).

█ HUD's decision to provide Section 8 assistance for La Victoria II is vulnerable only if the Court finds that decision was arbitrary, capricious, or an abuse of discretion. *King v. Harris*, 464 F.Supp. 827, 836–37 (E.D.N.Y.1979). On May 19, 1978, HUD determined that, based on the number of assisted housing units funded in fiscal 1977 in the non-minority areas of Boston, "sufficient comparable housing opportunities do exist in non-minority areas to balance the

funding of Viviendas II"; furthermore, the agency determined that "the construction of this 207 unit project in this densely populated area with approximately 13,000 housing units will not in any event significantly increase the proportion of minorities in the area." These determinations were made pursuant to § 883.112(c). HUD also determined, pursuant to § 880.112(d), that the project would not produce an undue concentration of assisted persons in the South End. Based on the record before the Court, I rule that HUD's determinations that Section 8 funding for La Victoria II complies with §§ 880.112(c) & (d) are adequately supported and are not arbitrary or capricious. I therefore decline to continue the injunction on this final ground.

V

Based on the foregoing, I rule that the defendants have complied with the terms of this Court's order of March 27, 1979, and that plaintiffs have asserted no legally valid reason to justify continuing the injunction. Therefore, an order should enter vacating the injunction and dismissing this case.

One final matter deserves discussion. There is a statement in the SEC to the effect that the developer has decided to rehabilitate the eight buildings within the Historic District, "if feasible." Based on that conditional language, plaintiffs have expressed concern as to the true intentions of the developer with regard to rehabilitation. However, the rest of the documents submitted to the Court make it clear that the project is to proceed with the rehabilitation, not demolition, of these eight buildings, and the Section 106 review was conducted on that basis. Suffice it to say that a change of heart down the road might invalidate the Section 106 review; the Court would, at that point, consider a motion to reopen this litigation.

Order accordingly.